# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

KNIGHT CAPITAL PARTNERS CORPORATION,
a Michigan Corporation,

Case No.
Hon.

       Plaintiff,

v.

HENKEL AG & COMPANY, KGaA,
a German partnership limited by shares,

       Defendant.

> **PLAINTIFF'S
> COMPLAINT AND
> JURY DEMAND**

---

## PLAINTIFF'S COMPLAINT AND JURY DEMAND

Plaintiff Knight Capital Partners Corporation, through its attorneys, Kickham Hanley PLLC, states the following for its Complaint against Defendant Henkel AG & Company, KGaA:

### INTRODUCTION

1.    This action challenges the unlawful conduct of one of the world's largest corporations—Henkel AG & Company, KGaA ("Henkel KGaA"). In order to hijack hundreds of millions of dollars in potential profits from an extraordinarily lucrative business venture brought to its U.S. affiliate by Plaintiff Knight Capital Partners Corporation ("KCP"), Henkel KGaA breached a valid and binding nondisclosure agreement in an attempt to acquire direct access to a unique cleaning technology used in oil refinery maintenance, and thus, commandeer all profits from the venture. In doing so, Henkel KGaA tortiously interfered with KCP's prospective business relationship with Henkel KGaA's U.S. affiliate, Henkel Corporation.

2.      KCP was the owner of a global license for this unique cleaning technology (the "Technology") that was incorporated into novel cleaning products such as "Biocide," "Bioguard," "Citrus Salt," and "Blast-it" (the "Products") for use in the oil and gas extraction and refinery maintenance sectors.

3.      In February 2014, KCP approached Henkel Corporation ("Henkel US") to partner with KCP in marketing and distributing the Products in order to fully exploit the Technology's global potential.[1] The KCP/Henkel US negotiations were active and ongoing for over a year and are generally referred to herein as the "Distribution Deal" or the "Project."

4.      KCP believed that Henkel US, with its reputation as a leader in ethics and sustainability, as well as its global name-brand recognition (*i.e* because of its "Loctite" brand), was a perfect vehicle for KCP's business venture.  Moreover, contracting with Henkel US as the distributor of the Technology fit KCP's business model of linking smaller regional companies with larger entities for maximum market penetration and sales.

5.      For months leading up to Henkel KGaA's wrongful conduct, Henkel US and KCP engaged in productive contract negotiations for what all the participants agreed was an extraordinary opportunity for both Henkel US and KCP to revolutionize oil refinery maintenance by introducing a cleaning technology and process that was (in comparison to traditional refinery maintenance solvents and processes) more effective, safer,

---

[1]      Where appropriate, Henkel U.S and Henkel KGaA are collectively referred to herein as "Henkel."

environmentally friendly (biodegradable), less toxic, and offered customers a financial upside by providing a more efficient process and increasing refinery operational uptime.

6.      Though KCP had brought the technology to Henkel US with the intent of developing a long-term partnership, as the Project moved up Henkel's corporate hierarchy, and Henkel KGaA became more and more involved in the negotiation process (and thusly, more aware of its profit potential) at least one member of Henkel KGaA's management developed a different agenda—*i.e.,* to eliminate KCP from the business equation altogether and assume exclusive control over the Technology and the profits generated from its sales. As Henkel KGaA's Senior Vice President & General Manager in Europe, Cedric Berthod, once rhetorically inquired of KCP's founder and CEO, Fadi Nona, near the end of the parties' negotiations: 'What does Henkel need from you now?' At the time, KCP did not know that Mr. Berthod, acting on behalf of Henkel KGaA, would breach Henkel's nondisclosure agreement with KCP by contacting the purported owner of the Technology in an attempt to secure Henkel KGaA's direct control over the Technology.

7.      Henkel KGaA knew about KCP's business interest and investment in the Technology Distribution Deal with Henkel US and intentionally thwarted execution of the parties' distribution contract (the terms of which were materially final) by delaying and impeding contract negotiations, and ultimately just ignoring the parties' confidentiality agreement to circumvent KCP's position in the Project. Henkel KGaA's wrongful conduct caused KCP specific and substantial financial harm.

8.     Henkel KGaA, with an intent to harm KCP, maliciously and in bad faith: (a) interfered with the business expectancy and relationship between KCP and Henkel US; (b) stripped KCP of its business opportunity and expectancy with Henkel US; and (c) made it impossible for Henkel US to close the Distribution Deal.

9.     Henkel KGaA's intentional and malicious conduct, including its breach of the nondisclosure agreement, was specifically designed to harm KCP and was not to Henkel US's financial benefit, because Henkel US was also significantly harmed by Henkel KGaA's actions. KCP would have closed its deal with Henkel US.  Instead, Henkel KGaA destroyed KCP's involvement in a highly lucrative business venture in order to wrongfully orchestrate sole ownership and control over a billion dollar venture that clearly could have sustained all of its partners.

## THE PARTIES

10.     Plaintiff Knight Capital Partners Corporation ("KCP") is a Michigan corporation with its principal place of business in Farmington Hills, Michigan.  KCP is a privately held capital firm established to provide regional companies the ability to tap into global markets and fuel their growth.  KCP's mission is not to just "broker deals" but to take a long-term interest in its partnering companies in order to develop business synergies and facilitate organic growth between these companies and establish mutually beneficial and lucrative business opportunities. As part of its Merger & Acquisition and Licensing operations, KCP specializes in connecting small, regional companies that offer unique technologies or products with larger companies that can ensure full global potential of that

4

product or technology. KCP is also in the business of developing and licensing specialty chemical technologies for use in industrial applications globally. Most relevant to the allegations herein, pursuant to a licensing agreement KCP held with the owner of the Technology, KCP believed it was the exclusive global licensor of the unique Technology used in oil refinery cleaning and maintenance.

11.     Defendant Henkel AG & Company, KGaA ("Henkel KGaA") is a Fortune 500 Company with a broad, diverse customer base and a complex technology portfolio. Henkel KGaA, through its various global affiliated companies, is a leading manufacturer of adhesives, sealants, and functional coatings worldwide and is best known globally for its adhesive brand Loctite, which is a bonding technology used in virtually every industry including, but without limitation, automotive & transportation, building, construction & furniture, electronics, industrial assembly, maintenance, repair & overhaul, and medical, hygiene & drug delivery. Henkel KGaA prides itself on being a solution provider for adhesives, sealants and functional coatings worldwide, offering a comprehensive portfolio of tailor-made solutions, outstanding customer support and sustainable value for its customers.

12.     Henkel may be globally recognized for its Loctite brand name, but its business operations are diverse, and include eight technology platforms expanding into 60 technology categories. Of specific interest to the events of this complaint is Henkel KGaA's name-brand recognition in the Maintenance, Repair & Overhaul ("MRO") business. Indeed, Henkel KGaA holds itself out as a leader in maintenance and repair

solutions, offering a range of products, services, and training to reduce downtime, increase productivity, and help maintenance professionals repair and extend the life of plants and equipment.

13.     Henkel Corporation ("Henkel US") is a Delaware Corporation and an indirect subsidiary of Henkel KGaA.  Henkel US is a direct subsidiary of Henkel of America, Inc.  Henkel of America, Inc. is a direct subsidiary of Henkel of America I, LLC. Henkel of America I, LLC is a direct subsidiary of Henkel KGaA.  While Henkel KGaA indirectly owns Henkel US, Henkel KGaA has represented under oath to another federal court that Henkel KGaA does not "control" or "manage" the operations of its U.S. subsidiaries, and that those subsidiaries are "independent."  *See* Exhibit A, May 4, 2015 Affidavit of Dr. Regina Jager, submitted in *Lapina v. Men Women N.Y. Model Management, Inc.*, Case No. 114-cv-6890 (S.D.N.Y).  Henkel US operates a MRO business as well as markets a wide range of well-known consumer and industrial brands, including Dial soaps, Purex laundry detergents, Right Guard antiperspirants, göt2b hair styling products, and Loctite adhesives. Henkel US employs over 6,200 employees in 51 sites across the U.S. and Canada.

14.     Specifically, Henkel US's facility in Madison Heights, Michigan is the "center of excellence" for cleaners and functional coatings in North America—the product line that KCP's Technology would have become associated with at Henkel US.  Indeed, the vast majority of research and development for cleaners and functional coatings in the US is done in Madison Heights, Michigan.  Warren, Michigan is the major manufacturing facility

for cleaners and functional coatings in North America. Products of these types are predominantly manufactured in Warren, Michigan and shipped directly to customers throughout North America.

## JURISDICTION AND VENUE

15.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2). The amount in controversy exceeds $75,000, exclusive of interest and costs.

16.     Specific personal jurisdiction exists in this case because, among other things, at least one representative from Henkel KGaA travelled to Madison Heights, Michigan as part of negotiating and implementing the thwarted Distribution Deal upon which the allegations herein are based, establishing a substantial connection to Michigan through its actions. *See e.g. Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475-76, 105 S.Ct. 2174 (1985) (quotations and citations omitted); *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 721 (6th Cir. 2000).

17.     Specifically, on December 10, 2014, at Henkel KGaA's request and in furtherance of the Distribution Deal negotiations, KCP arranged for a demonstration of the Technology at Henkel US's facilities in Madison Heights. At the meeting were representatives from KCP's Technology Partner, AI Sealing LLC ("AIS"), KCP, Henkel US, as well as Grant Kupko from Henkel KGaA, who flew in from Germany specifically to attend. Moreover, the process to set up KCP as a vendor of Henkel US, a necessary step in the Project, was managed out of Henkel US's Madison Heights facility. Indeed, Henkel US's facility in Madison Heights was expected to be the seat of operations for the

Project, as the "global center of excellence" for Henkel KGaA's MRO cleaning business operations, and in fact, Henkel's Global Technology Manager for these technologies, Zubin Rivetna, was stationed in the Madison Heights, Michigan facility to be proximate to his development colleagues. Accordingly, because Michigan was selected to be the Project's primary operational forum, and because while negotiating the Project, Henkel KGaA representatives emailed and/or telephoned KCP representatives in Michigan on a regular, if not daily, basis, Henkel KGaA could foresee being "haled before" a Michigan court. *Khalaf v. Bankers & Shippers Insurance Co.*, 404 Mich. 134 (1978).

18. Henkel KGaA purposefully availed itself of the privilege of acting in Michigan and sufficient minimum contacts exist with respect to Michigan such that "the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Air Products and Controls, Inc. v. Safetech Int'l, Inc.,* 503 F.3d 544 (6th Cir. 2007) (quoting *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

19. Venue is proper in this District pursuant to 28 U.S.C. § 1391(c)(3) because a defendant that is not a resident of the United States may be sued in any judicial district.

## OVERVIEW OF THE KCP/HENKEL US TECHNOLOGY DISTRIBUTION DEAL

20. In February 2014, KCP initiated an original business venture involving licensing and marketing the Technology—which, as described above, is an innovative cleaning solvent used in the oil and gas refinery maintenance sectors that was less toxic, more efficient, and biodegradable. Implementing the Technology would improve worker

8

safety, increase refinery uptime, reduce a refineries' environmental footprint, and would be overall less expensive than traditional maintenance processes by, among other advantages, eliminating the expense of water containment and treatment.

21.     In February 2014, KCP's founder and CEO, Fadi Nona ("Nona") met Marsha Feltingoff, a broker for AIS, the company which ostensibly developed and exclusively owned the Technology.[2]   Nona commenced discussions with Feltingoff regarding a potential partnership between AIS and KCP whereby KCP would acquire an exclusive license to market the Technology—and specifically KCP would exclusively market the Technology to Henkel US for distribution.

22.     On February 13, 2014, in order to facilitate negotiations and investigate the feasibility of a future business relationship between them, AIS and KCP executed a Unilateral Confidentiality Agreement (the "AIS NDA"), which prohibited AIS from disclosing "any and all past, present, and future prospective buyers, licensees, manufacturers, vendors, distributors, and any other type of prospective company, corporation, LLC, or client brought forth by KCP."

23.     KCP's goal was to acquire an exclusive license for the Technology from AIS. It could then approach Henkel US to distribute the Technology in refinery cleaning and industrial applications.   KCP believed that Henkel US, with its established connections and brand recognition (Loctite), would be a great fit to work with KCP to fully realize the

---

[2]     KCP has since learned that AIS was not the exclusive owner or developer of the Technology, and that AIS and Feltingoff misrepresented this fact to further AIS's interest in the Distribution Deal.

Technology's potential because Henkel US could easily tap into its readily available customer market. Moreover, KCP could think of no better potential business partner than Henkel US, an acknowledged world leader in ethics and sustainability, with a brand name that virtually all industries use and trust.

24.    In late February 2014, encouraged by his discussions with AIS/Feltingoff, Nona approached Henkel US to assess what interest, if any, it might have in partnering with KCP to market and distribute the Technology to its refinery and extraction customers.

25.    Henkel US expressed significant interest in the new Technology and sought to further its communication with KCP. Henkel US had been seeking to enter the refinery cleaning industry for years, had made entering into the refinery cleaning industry part of its 5-year growth strategy, and upon learning of the Technology, expressed to KCP that the Technology may be the perfect way to achieve this goal.

26.    Nona (KCP) was introduced to Henkel US based Global Technology Manager Zubin Rivetna ("Rivetna"), who would lead the initial negotiations between KCP and Henkel US. Nona and Rivetna initially met in Birmingham, Michigan in late February 2014 to discuss the Project. At this meeting, Rivetna provided Nona with an initial list of questions and requested information that Henkel US would need to proceed with the Project. Nona assured Rivetna that he would compile all requested information so that Henkel US could evaluate the Project and determine if it was a fit for Henkel US to move forward.

27.     Discussions between KCP and Henkel US continued throughout early 2014. On April 23, 2014, Henkel US signed a Unilateral Confidentiality Agreement (Exhibit B, the "Henkel NDA"), pursuant to which Henkel US, on behalf of itself and all of its affiliates, including but not limited to Henkel KGaA, agreed not to disclose or use any confidential information except for the stated purpose of the agreement, which was to facilitate investigation of a future business relationship between KCP and Henkel US. *See* Exhibit B, Sec. A ¶ 2; Sec. B, ¶ 2.1 and ¶ 2.3. Once Henkel US signed the Henkel NDA, negotiations expanded even more and KCP began to disclose specific and detailed information to Henkel US—including identifying AIS as KCP's Technology Partner as well as sharing specific information about the Technology's properties.

28.     Henkel US's counsel, John Preysner, drafted the parties' NDA, and specifically included language that bound Henkel US's "Affiliates," including Henkel KGaA. Henkel KGaA knew about the Henkel NDA and reviewed its terms, and thus, knew that as an Affiliate of Henkel US, Henkel KGaA was bound by the NDA's terms.

29.     In early May 2014, Henkel US, through Rivetna, stated that the Technology Distribution Deal was officially "going forward" and that Henkel US required KCP to be added as a vendor. During May 2014, through Henkel US's Madison Heights facility, KCP began the process of becoming a Henkel US vendor, providing all the necessary information requested by Henkel US—including banking information, tax id number, and other materials.

11

30.    Henkel US approved KCP as a vendor on or around June 10, 2014, although Henkel US did not issue KCP's vendor number until early October 2014.

31.    Simultaneously with the vendor approval process, Henkel US took the project to a "steering unit" to further vet the project.  A steering unit is an established internal business development and new project review committee that generally meets monthly and is comprised of both Henkel KGaA and Henkel US global managers, as well as representatives from all regions and affiliates, with decision-making authority to approve continued project development.   While representatives of other Henkel affiliates were part of the steering unit, it was always contemplated by all involved that the contractual relationship for the Project would be solely between Henkel US and KCP.

32.    Rivetna worked with KCP principals to prepare a formal presentation for the steering unit, which Rivetna presented in late June 2014.  At this time KCP was also working with Rivetna and others at Henkel US to "vet" the market—to ensure there was indeed a viable market with potential volume sales to warrant further discussion of the Project.

33.    The June 2014 steering unit presentation was a success and KCP received an official "green light" to move forward with Henkel US.  Specifically, after the presentation, the steering unit determined that a partnership with KCP fit the strategy of its Maintenance & Repair Operation ("MRO") business unit and that it could market the Technology to its refinery maintenance customers.  However, the steering unit also determined that it: (a) needed more information regarding whether there was any issue or conflict with Henkel's

sustainability strategy; (b) needed clarification and understanding regarding intellectual property issues; and (c) needed KCP and Henkel US to discuss the business model and determine how the business would operate once the Technology Distribution Deal closed.

34.     On or around July 15, 2014, in response to the issues raised by Henkel's steering unit during the June 2014 steering unit presentation, KCP sent to Rivetna an additional presentation entitled "KCP Value Added Proposal" through which KCP further described the Technology's unique fit within Henkel US's Maintenance & Repair Operations unit, outlined a proposed business model, and explained the intellectual property protection attached to the Technology.

35.     On or around August 2, 2014, Henkel US informed KCP that the Technology Distribution Deal was approved for a pilot project in North America.  It was around this time that Henkel KGaA's MRO Global Market Segment Director, Grant Kupko ("Kupko") became involved with negotiating the Distribution Deal.  On August 3, 2014, KCP sent Henkel US an action plan outlining the next steps needed to move forward with the project.  On or around August 8, 2014, KCP received word from Henkel US's procurement team that KCP's vendor on-boarding was complete. By this time frame, KCP and Henkel US were communicating about the Project regularly and often in email and by telephone.

36.     On or around August 13, 2014, Kupko expressed concern regarding Henkel's blending capacity for the Technology and informed KCP that Henkel would not invest capital to open a new blending facility to produce the Products.  Henkel (through Kupko)

13

stated that it did not want to mix the Products, it simply wanted to "put a Henkel label" on the Products and distribute them.

37.    KCP readily resolved this issue by bringing Magnablend, a company that has over 750 blending sites worldwide, into the deal.  On July 17, 2014, KCP had already negotiated a Unilateral Confidentiality Agreement with Magnablend in order to be able to discuss the Technology for use in upstream and midstream industries outside of the downstream refinery maintenance and cleaning KCP was exclusively reserving for Henkel US.    Thus, KCP was able to immediately discuss Henkel's blending issues with Magnablend in confidence under Magnablend's NDA.

38.    During August 19, 2014 to August 21, 2014, KCP met with Magnablend in Dallas TX to secure Magnablend as the exclusive blender for the Distribution Deal with Henkel US. KCP commenced negotiating a contract with Magnablend that provided that Magnablend would exclusively blend the Technology and sell the Products to KCP.  KCP and Magnablend finalized this contract, the KCP/Magnablend Manufacturing and Supply Agreement, in January 2015.

39.    During this same period, from August 19, 2014 to August 21, 2014, KCP also met with AIS in Houston to begin negotiation of the exclusive license agreement for the Technology.   KCP and AIS finalized and executed their Trade Secret and Technology License Agreement on or around November 5, 2014.

40.    August through October 2014 was a crucial development time for the Distribution Deal. KCP's and Henkel US's negotiations were cumulating into specific terms based upon the following events:

a. KCP, Henkel US (Rivetna) and Henkel KGaA (Kupko) scheduled weekly Friday conference calls to discuss open action items. KCP provided specific details of the blending process in preparation for the pilot program in North America.

b. The Henkel US "3PM" team became involved.  3PM stands for "3rd Party Manufacturers" and is the Henkel US purchasing group that manages outside vendors and toll blenders.  Inclusion of the 3PM was a demonstration of Henkel US's commitment to the Distribution Deal.

c. On September 11, 2014, Kupko emailed KCP an outline detailing the steps necessary for Henkel US to move forward, including identifying all the new teams and departments that would be involved.  This detailed email further demonstrated Henkel US's commitment to, and intent to close, the Technology Distribution Deal.

d. September 2014 found KCP and Henkel US finalizing legal requirements for labeling the Technology and ensuring that any State, Federal and EPA regulations were met—this included getting a supporting opinion from the law firm of Keller and Heckman LP assuring Henkel US and KCP as to the legitimacy of the EPA registrations related to the Technology.

e. KCP and Henkel US were also setting pricing schedules, preparing marketing materials and involving Henkel KGaA's internal sales team and management to put together initial pricing suggestions, sales kit, and potential questions and objections that may arise in the marketplace.

f. On 10/1/2014 KCP received its official vendor number from Henkel US.

g. In October 2014, Rivetna, Kupko and Nona compiled a client list to target once the deal closed. This client list was significant, demonstrating the large size and scope of the market and potential reach of the Distribution Deal.

41. On November 5, 2014, KCP finalized and executed the Technology License Agreement with AIS which, upon closing, granted KCP "a worldwide right and exclusive license to use and commercialize the Technology" during the term of the license. Exhibit C, ¶ 1. The AIS Technology License agreement contemplated a future closing no later than sixty (60) days from the effective date of November 5, 2014 (the "Closing Deadline")—and closing was conditioned upon KCP demonstrating that it has obtained a "sublicense between [KCP] and Henkel Corporation, a division of Henkel AG & Co. KGaA." Exhibit C, ¶ 7. The term of the AIS Technology License was for five years, unless properly terminated by its terms. The AIS Technology License could be properly terminated if the closing did not occur by the identified Closing Deadline. *See* Exhibit C, ¶ 15.

42. In November 2014, Henkel required that KCP meet with Henkel KGaA's upper MRO management to discuss the Project, explain the business model and flow,

respond to questions, create a legal outline so a formal Distribution Agreement could be drafted, and outline the steps to finalize the Distribution Deal.   On 11/13/2014, KCP and Henkel agreed to meet at Henkel's US offices in Bridgewater, NJ on November 21, 2014. *Id.* Significantly, at this meeting, the top MRO manager from Europe, Cedric Berthod and the head of Global General Industry business (and Berthod's immediate supervisor), Jerry Perkins, were scheduled to be in attendance.  Henkel US representatives were excited that Henkel KGaA's top business managers had called this meeting and repeatedly expressed to KCP's CEO Fadi Nona that this meeting was key to moving the Project forward and finalizing a formal distribution agreement.

43.    On November 14, 2014, Henkel US presented the first draft of the agreement to KCP and within days, Kupko, Rivetna, and Nona had discussed and reviewed the contract.

44.    On November 21, 2014, KCP and Henkel held an extended meeting in Bridgewater, NJ, at which time KCP formally presented the Project to Henkel KGaA's top management.  Present at the meeting were Henkel representatives Jerry Perkins (US), Steve Essick (US), Mike Quail (US) and Cedric Berthod (KGaA).  Fadi Nona represented KCP and Marsha Feltingoff represented AIS.

45.    At the November 21, 2014 meeting, Cedric Berthod, Senior Vice President & General Manager of Henkel KGaA's General Industry Group ("Berthod") became the lead on the Project, and affirmed on behalf of Henkel that "the proposed business opportunity is attractive and the fit with Henkel MRO strategy is real.  Therefore, we agree[] to pursue

the development of a formal agreement." Berthod further outlined five topics that he determined needed to be addressed in order to execute the distribution agreement. *Id.*

46.     At the time, direct involvement of Henkel KGaA at this level signaled to KCP a clear advancement towards finalizing the deal with Henkel US. Indeed, during this time period (late 2014), Berthod expressed to KCP that he wanted to take the Project from a pilot in North America to a full global project and requested KCP's assistance and information in order to pitch the Technology to one of Henkel KGaA's largest clients.

47.     By December 2014, KCP and Henkel were engaged in daily email communication and in weekly telephone calls which increased in frequency as drafts of the proposed distribution agreement were revised and redistributed for review. Berthod's desire to take the pilot project globally infused new energy and excitement in the Project as well as expanded the scope of issues for the KCP team to work on and negotiate. Specifically, with the prospect of taking the project global, KCP sought an upfront payment of $3.5 Million from Henkel US at the time of closing.

48.     Between December 5, 2014 and May 2015 over 20 versions of the proposed distribution agreement were circulated, revised, and recirculated.

49.     Throughout December 2014, KCP's review and discussion of the revised agreements received from Henkel KGaA was immediate—often occurring on the same day as the revision was distributed. Regularly, KCP and Henkel KGaA (Kupko) and Henkel US (Rivetna) would jump on a call and go through proposed revisions section by section before returning to Henkel KGaA for review.

50.     One specific event required by Henkel KGaA's MRO Management (specifically, Berthod) was to witness the Technology in action.  On Dec 10, 2014, KCP, AIS and Henkel US representatives met in Madison Heights, Michigan at a Henkel US facility lab to do an onsite Product test.  The demonstration was successful and Henkel was pleased, stating the meeting was "very productive and informational."

51.     The parties again met again via conference call on December 17, 2014 to review the contract terms.  Present were Kupko and Berthod (Henkel KGaA), John Preysner (Henkel US legal, but taking direction from Berthod/Henkel KGaA), Melvin Babi (KCP's counsel), and Marsha Feltingoff (AIS).  After this meeting, Henkel KGaA (specifically, Berthod instructing Preysner) agreed to have the contract draft revised and returned by 1/25/2015.

52.     On December 19, 2014, Nona sent Berthod an email outlining the remaining issues that KCP needed to complete, which Nona and Berthod discussed via telephone on the same day.  At the close of 2014, KCP believed the Project to be unstoppable.  Based upon Berthod's representations, KCP understood that the distribution agreement with Henkel would be finalized after the holidays.

53.     In January 2015, as another stipulation towards finalizing the Distribution Deal, Henkel KGaA sought to meet with KCP's third-party blender, Magnablend, and tour its main facility in Texas to assure Henkel that Magnablend, as the exclusive blender of the Products for distribution to Henkel's customers, could supply the large quantity of Product that Henkel intended to sell.

19

54.     KCP, Henkel and Magnablend met on January 28, 2015, after which Henkel affirmed that Magnablend would be the global blending partner.  At Henkel's instruction, Magnablend started the process of becoming a vendor in the Henkel US system.

55.     Even after the January 28, 2015 meeting, Henkel KGaA remained concerned about not having direct access to Magnablend, who had signed an exclusive agreement with KCP.  To alleviate Henkel KGaA's concerns, and seeing it as the only way to move the Project forward, KCP conceded to a secondary, limited "clone contract" between Henkel US and Magnablend to ensure Henkel would have a direct relationship with Magnablend in case KCP was (somehow) no longer in the partnership.

56.     January 2015 saw KCP receiving fresh assurances from Berthod that Henkel KGaA's legal counsel was "satisfied" with KCP's agreement with Magnablend and was "actively working" on the distribution agreement, and that Berthod was receiving "positive feedback" from Henkel KGaA regarding the Project.

57.     Under the still forming distribution agreement, Henkel US and KCP were both charged with marketing responsibilities and driving demand for sale of the Products. And though the distribution agreement was not yet signed, the parties still conducted business as if execution of the agreement was imminent.  Indeed, business planning between KCP and Henkel US with regard to marketing, sales, new hires, supply side logistics, and implementing "voice of the customer"[3] feedback questionnaires (among

---

[3]     Voice of the Customer ("VOC") is a market research technique that produces a detailed set of customer wants and needs, organized into a hierarchical structure, and then prioritized in terms of

other operational issues) was on a severely faster track than the stalled contract negotiations involving Berthod at Henkel KGaA.

58.     Thus, even though contract negotiations were ongoing, both Henkel and KCP started approaching customers and companies about the Products.   To facilitate customer interaction, Kupko, Rivetna, and the KCP team drafted marketing and sales material for approaching customers.   Specifically, Kupko outlined the direction for approaching clients and identified questions that should be asked of potential customers to ascertain their needs.

59.     At this time, Henkel KGaA (Berthod) requested that KCP provide a list of KCP's customers and clients that KCP could bring to the table.   As a demonstration of good faith, to show that KCP was capable of bringing substantial assets into the bargain by being able to immediately drive demand, and believing that the distribution agreement was close to being finalized, KCP provided the requested customer contact information to Henkel KGaA.

60.     By the middle of January, Henkel KGaA began contacting KCP clients.

61.      KCP would not have disclosed such proprietary information or permit Henkel to contact KCP's long-standing client based just to give the business directly to Henkel.   KCP disclosed this information based upon Henkel KGaA's upper MRO

---

relative importance and satisfaction with current alternatives. Voice of the Customer studies typically consist of both qualitative and quantitative research steps and are used at the beginning of implementing a procedure or introducing a product into the market place in order to better understand the customer's wants and needs, and as the key input for new product definition, design and quality control issues.

management providing repeated assurances that the Project was moving forward and distribution agreement was nearly final.

62.     By the end of January, Henkel KGaA circulated yet another version of the proposed distribution agreement, incorporating terms related to the expansion of the Project from just North America to Global.  Specifically, these terms involved referencing the expanded markets requested by Henkel KGaA, hammering out supply chain clarifications, as well as adding Magnablend as a party to the agreement.  KCP believed that these modifications were the primary reason execution of the final contract between KCP and Henkel US had been delayed—because the Project had changed from a pilot program to a global contract, the parties' contract negotiations necessarily intensified.  At the time, KCP had no other reason to believe there was another, more nefarious reason for the delay.

63.     In February 2015, Berthod requested that the KCP team travel to Germany to hammer out the remaining details of the distribution agreement in person.  In his email correspondence requesting the meeting, Berthod stated that "only 5% is left" with respect to finalizing the contract—and that even that 5% was essentially resolved.

64.     On February 18, 2015, Nona and Berthod scheduled a conference call to discuss incorporation of Henkel KGaA's commercial terms into the agreement between Henkel US and KCP. Berthod sent an email just prior to the scheduled call outlining specific commercial terms based on the parties' negotiations.

65.     On February 20, 2015 Henkel US's counsel, John Preysner, called KCP and stated that the final terms for the distribution agreement were waiting on "approval from Germany."

66.     By February 26, 2015, based upon emails sent from Henkel KGaA, KCP believed that all material terms had been agreed upon and that the only remaining step was to sign the distribution agreement.   The material terms of the distribution agreement included:

   a.   The agreement was under a 5-year terms with an option to renew.

   b.   Henkel US would have an exclusive, global license for the Technology for use in the refinery maintenance and cleaning industry. The Technology would be branded under Henkel's "Loctite" brand.

   c.   An up-front $3.5 Million "distribution fee" to KCP, subject to certain refund conditions should KCP not be able to produce two invoiced customers over an 18-month period.

   d.   In exchange for the upfront $3.5 Million payment Henkel would have direct access to the KCP's Technology Partner, AIS, who would provide direct access to the Technology, customer and technical support, and technical training.

   e.   Commissions were to be paid on a split margin of 49% to KCP/51%  to Henkel US until KCP had been paid $20 Million in commission. Thereafter the margin split would move to 33% to KCP and 67% Henkel US.

67.     The meeting requested by Berthod to finalize the agreement was scheduled to be held in Germany on March 3, 2015 and March 4, 2015.  *See* Email correspondence dated March 2, 2015 identifying the attendees of the meeting in Germany and attaching the agenda for the meeting.  Nona and Bell attended on behalf of KCP.

68.     During these meetings, Henkel KGaA's and KCP's commercial terms as well as a "go to market" plan were discussed.  Henkel KGaA's MRO management (Berthod, Enke, Kupko) all agreed to the distribution agreement's terms.  The issue of third party agent sales commissions was the only major open issue, and more specifically, Berthod's objection to the commission that KCP intended to pay KCP's agents.  Indeed, it seemed that Berthod was irrationally affronted by the amount of money KCP's agents could receive under the Deal, and though this aspect of the contract negotiations did not affect Henkel and should not have been an issue, it became a personal sticking point for Berthod and, upon information and belief, was the catalyst for Berthod, on behalf of Henkel KGaA, to breach the NDA, approach AIS directly, and thwart KCP's interest in the Distribution Deal.

69.     To KCP's surprise, the distribution agreement was not executed at the completion of the March 2015 meeting, though Berthod sent a follow up email to KCP on March 5, 2015 outlining the agreements reached, and Kupko sent a follow up email on March 11, 2015 which recapped the meetings in Germany and outlined a task list for completion by the parties.  Further, Rivetna distributed the updated commercial terms and profit split between Henkel US and KCP.

70.     Following the meeting in Germany, Henkel's focus and energy on the Project escalated.  Henkel KGaA repeated its request that KCP start to pursue customers immediately. Berthod and Rivetna both came to Nona with marketing opportunities in Europe and India.

71.     March 2015 was a flurry of activity on the Project including indications that securing customers and procuring sales would be immediate upon closing:

a.  Berthod was working on a meeting with Henkel's Executive Committee, which would support the project for Global implementation.

b.  Rivetna had received a positive VOC from Henkel's customer in Mumbai stating that it wanted to apply the Technology as soon as possible after closing.  KCP discussed the VOC with Henkel in preparation for the launch.

c.  Berthod requested that KCP's Craig Bell attend a Project implementation meeting in Mumbai, India as part of a global MRO Steering Unit meeting.  The purpose of the meeting was to discuss the Project and plan for the implementation strategy in each region.  At this meeting, Bell met with all of Henkel's MRO regional managers, the lead technical service engineer for the Project, the MRO product development lead for the project, as well as, Berthod, Kupko, and Rivetna, all of whom had been flown in by Henkel KGaA. A main topic of the meeting was the KCP Project and Technology.

72.     In March 2015, Henkel KGaA made what seemed like endless requests of KCP involving such things as approving various modifications to the contract, marketing

actions, customer contacts—all of which KCP provided—except one. Specifically, Henkel KGaA had been pressuring KCP for months to provide unfettered access to the Technology (including the specific formulas and processes) and direct communication with KCP's technology partner, AIS. KCP had executed NDAs with both AIS and Henkel to protect KCP's interest in this very situation.

73. KCP feared that Henkel KGaA (Berthod) wanted direct access to the Technology in order to provide it to Henkel KGaA's head of Product Development, John Cocco. Should this occur, Henkel KGaA could reverse engineer the Technology and processes and seize KCP's interest in the entire Project. Thus, Nona advised Henkel KGaA (Berthod) that it would be best for all involved to sign the distribution agreement, and that if Henkel KGaA wanted direct access to AIS and specifics on the Technology, the distribution agreement would need to be finalized and signed.

74. By early April 2015, KCP was again in a holding pattern with Henkel KGaA, who, after KCP communicated that it would not permit Berthod direct access to AIS, had gone "radio silent." KCP had very little communication with Henkel KGaA or Henkel US, and some Henkel US insiders informed KCP that Berthod and Preysner had advised the Henkel US team to have no contact with KCP.

75. On or around April 11, 2015 Berthod informed Nona that Henkel KGaA's Executive Vice President of Adhesive Technologies and member of its Management Board Jan-Dirk Auris had given the green light to pay KCP its upfront fee of $3.5 Million that KCP required as part of taking the Project global. This was ostensibly the last

remaining hurdle before Henkel US could execute the Distribution Agreement. However, despite having no remaining obstacles, the distribution agreement was still not finalized. Berthod promised that he would take it up with Henkel US's counsel, John Preysner.

76.     In mid-April, KCP's NDA with Henkel US was getting close to expiring. KCP had pursued Henkel for over a month to extend or sign a new NDA. Despite repeated requests from KCP's counsel, Henkel's legal counsel, Preysner, refused to address this issue. Furthermore, Nona contacted Berthod advising him of the NDA issue without response. There was virtually no communication from Henkel KGaA at this time, outside of what was now, KCP believed, rote reassurances that the contract was "almost final."

77.     Under the terms of the Exclusive Licensing Agreement ("ELA") that KCP held with AIS, unless extended by agreement of the parties, AIS could terminate the ELA if the closing with Henkel US did not occur by the "Closing Deadline" defined in the ELA to mean "on or prior to sixty (60) days from the "Effective Date" of November 5, 2014.

78.     Because he had reviewed the ELA as part of KCP's negotiations with Henkel KGaA, Berthod, and thusly Henkel KGaA, knew that AIS could terminate its ELA at any time after January 5, 2015.

79.     On April 17, 2015, AIS terminated its Exclusive Licensing Agreement with KCP under its terms. KCP believed at the time that AIS terminated because it did not want to wait any longer for Henkel US to finalize its deal with KCP. (KCP now believes that AIS terminated its Exclusive Licensing Agreement because it was in direct communication with Berthod/Henkel KGaA and was in negotiations for a "better offer.")

80.     On April 20, 2015, KCP notified Henkel of AIS' termination letter.  Henkel KGaA agreed to move forward with the contract between Henkel US and KCP whether or not AIS was involved—indeed, Berthod directly expressed that he believed that AIS was only "causing issues" and it was better that AIS was not involved.

81.     Indeed, faced with the prospect of not having AIS as its Technology partner, KCP began formulating "Plan B" for the Project,[4] which KCP presented to Henkel KGaA on or around April 30, 2015.

82.     In its April 30, 3015 Plan B proposal, KCP reassured Henkel US and Henkel KGaA that AIS was not needed to close the Distribution Deal and move forward with the Project for the following reasons:

  a.  AIS did not have exclusive licensing to the Technology—and had misrepresented this fact to KCP and Henkel.

  b.  KCP had the Technology roadmap and could develop the Products and Process documentation to enter the market with Henkel in under 90 Days.

  c.  KCP had the requisite relationships to immediately drive demand and bring large customers on board quickly.

  d.  KCP had the expertise to make formula customization and had global solvent blending capability through KCP's exclusive blending agreement and partnership with Magnablend.

---

[4]     As part of the unwinding of its relationship with AIS, KCP discovered that AIS did not have an exclusive right to license the Technology, which properly belonged to another entity.  Ultimately, in November 2015, KCP procured an agreement from the true producer and owner of the Technology.

e.  Indeed, based upon Henkel KGaA's representations that it did not want to invest any capital to open a blending facility for the Project, KCP's exclusive partnership with Magnablend was a key component to implementing the Project with Henkel US because Magnablend had the capacity to customize and blend Products globally and reach customers quickly.  (*See infra* ¶¶ 36-38.)

f.  Thus, KCP reassured Henkel that a relationship with AIS was not needed and that AIS simply could not add the value, expertise, or experience that KCP and Magnablend could.

g.  Indeed, KCP's Plan B made it clear that KCP was fully capable of executing the Distribution Deal without AIS and even provided a detailed timeline as to how Plan B would unfold, including deadlines for contract execution (May 2015), lab demonstrations (June 2015), process documents completed (August 2015), customer demonstrations (September 2015) with the Technology in the marketplace by November 2015.

83.  On or around May 6, 2015, KCP sent a detailed presentation to Henkel KGaA further explaining why AIS was not necessary to close the Distribution Deal.

84.  KCP's May 6, 2015 presentation explained that there would be no legal, ethical, or compliance concerns in pursuing the Project without AIS based upon the following:

a. The NDA between AIS and KCP, which was executed on February 13, 2014, was unilateral and permitted KCP to use the information provided to it by AIS, but protected all information disclosed by KCP to AIS.

b. Information regarding the Technology was disclosed to KCP under this NDA on September 16, 2014 and October 9, 2014.

c. KCP was able to perform under the revised "Plan B" terms because the Technology Information in KCP's possession was an amalgam of data comprised of unprotected data and publically available information.

d. Any formulations developed by KCP and/or KCP/Henkel would be customized and thus necessarily different from any formulizations of AIS.

85.    KCP was so secure in its position, KCP even offered to indemnify Henkel from any action brought by AIS.

86.    Despite KCP's repeated requests, Henkel KGaA refused to extend Henkel US's NDA, which was set to expire on May 8, 2015.

87.    Regardless, the fact that AIS would not be involved in the project did not cause Henkel KGaA to abandon the project.  On May 8, 2015, Berthod communicated to Nona that he was discussing the "situation/proposal with Jan Dirk, Jerry and the team" and that a "final go no go decision" would be made by Henkel KGaA Executive Committee by May 14, 2015.

88.    On May 20, 2015 Berthod communicated to Nona that he had heard from Henkel's Executive Committee on or around Friday, May 15, 2015 and wanted to share the outcome with KCP's team.

89.    On May 22, 2015, Berthod expressed to KCP that, after considering KCP's Plan B, Henkel's Global Executive Committee was still interested in the Project, confirming that "Oil and Gas market and related technologies are strategic targets for Henkel" and that Henkel understood that "AIS cleaning technology…is no longer available to KCP."    Berthod expressed that Henkel was "open to adding KCP relevant technologies" to Henkel's portfolio, but before entering into a business relationship there were two concerns:

   a.  Henkel would need to have KCP's technology evaluated by a third party testing lab using a protocol devised by KCP and Henkel; and

   b.  Henkel wanted assurances that use of KCP's technology would not expose Henkel to legal action.

90.    Thus, by his May 22, 2015 correspondence, far from stating that Henkel US could not or would not close the Distribution Deal, Berthod acknowledged that the Distribution Deal was still very much alive.    Berthod admitted that there were only two (minor) issues that were identified by Henkel KGaA's Executive Committee preventing the Deal from closing—and both of these issues KCP had already addressed in its May 6, 2015 presentation.    Perhaps most importantly, Berthod admitted that a relationship with AIS was not necessary to closing the Distribution Deal.

91.    Nonetheless, after the May 22, 2015 email, Henkel KGaA ceased its communications with KCP until June 5, 2015, when Berthod requested a conference call with Nona.  During this telephone call, (which Berthod made while he was in Texas to Nona in Farmington Hills, Michigan) Berthod stated that:

    a.  He had been approached by AIS directly, and specifically approached by Marsha Feltingoff, who he understood was not part of KCP.

    b.  Berthold stated he would "finally" have the opportunity to meet with AIS representatives, which he had been trying to do for about "8 or 9 months."

    c.  Berthold further stated that he intended to pursue the Project with AIS directly.  Berthod stated he was curious about what AIS had to offer, and indicated that while "no decision" had been made as to whether or not to go with AIS or KCP, KCP's proposal to Henkel was on hold while Berthod pursued AIS.

    d.  Berthod explained that he was going to make a decision that was best for "the company"—Henkel KGaA.  However, Berthod's actions could not have been in the "best interests" of Henkel KGaA or Henkel US in that he breached Henkel's NDA, to "weed out the middle man" by reneging on a year's worth of negotiations with KCP to meet directly with AIS' broker, Marsha Feltinghoff.

92.    On June 7, 2015, KCP (Nona) sent Henkel KGaA (Berthod) an email, protesting Henkel KGaA's circumventing KCP to deal directly with AIS.  KCP alerted

Berthod that his actions on behalf of Henkel KGaA directly violated the NDA between Henkel and KCP.

93.     Berthod never responded to Nona's June 7, 2015 email.

94.     Based upon critical Henkel KGaA internal documents that KCP has in its possession, KCP now knows that after June 5, 2015:

    a.  Henkel KGaA fully pursued the Project without KCP and with AIS;

    b.  Weekly calls and meetings between Henkel KGaA and AIS had been taking place discussing the Project and covering such topics as sample updates, testing status, customer trial, commercial issues, and the Henkel KGaA/AIS NDA;

    c.  There would be no further communication between Henkel KGaA and KCP, nor Henkel US and KCP;

    d.  At a meeting of the monthly held steering unit, in front of Henkel's Global Managers, Berthod attempted to justify his circumvention around KCP by claiming that it was KCP that insisted on Henkel KGaA providing $20 Million in guarantees for AIS—not AIS that insisted upon same.  This specific contract term had been another sticking point for Berthod (and thus, Henkel KGaA).  Feltingoff ostensibly told Berthod that AIS never requested the $20M in guarantees. However, Berthod knew that this representation was untrue (and is actually refuted directly by Feltingoff in an email she sent to KCP).  Moreover, Henkel representatives Enke, Preysner,

and Kupko all knew that the statement was untrue and thus could not justify Berthod's exclusion of KCP from the Technology Distribution Deal.

95.    Berthod's actions constituted a clear breach of the NDA.  Henkel KGaA learned of AIS's existence and its purported ability to supply the Technology through disclosures KCP made under the NDA.  Moreover, Henkel KGaA obtained confidential information from KCP concerning the Technology which allowed Berthod to deal directly with AIS.  Absent KCP's disclosures under the NDA, Berthod would have been unable to even attempt to circumvent KCP by dealing with AIS directly.

96.    On July 12, 2015, Craig Bell, KCP's COO, travelled to Rocky Hill, Connecticut to see Berthod's direct supervisor at Henkel KGaA, Jerry Perkins ("Perkins") to protest Berthod's per se wrongful and malicious conduct aimed at eliminating KCP from the Project and destroying KCP's expected business interest in the Distribution Deal—a Project that KCP had created and brought to Henkel US.  Bell explained that in order to deal directly with AIS, Berthod necessarily and intentionally violated a valid NDA that bound Henkel from using any information gained from negotiating the Project— including use of the identity of AIS—except for the narrow purpose of negotiating the Distribution Deal.  Tacitly condoning Berthod's actions, Perkins told Bell that simply, there was "nothing he could do."

34

## COUNT I
## HENKEL KGAA'S INTERFERENCE WITH
## KCP'S BUSINESS EXPECTANCY WITH HENKEL US

97.     KCP restates and realleges its prior allegations herein.

98.     Henkel KGaA is the indirect parent company of Henkel US.

99.     Henkel KGaA and Henkel US are separate economic units and separate legal entities with independent business operations.

100.    KCP had a valid business interest and expectancy in the Technology Distribution Deal and a promising relationship with Henkel US.

101.    Henkel KGaA intimately knew the intricacies of the Technology Distribution Deal that KCP originated and developed with Henkel US over a period of months before Henkel KGaA, in bad faith, usurped control over negotiations of the Deal with KCP.

102.    Henkel KGaA clearly knew that the Technology Distribution Deal would be massively lucrative and that KCP, as the Deal's primary author and organizer, expected to—and was entitled to—benefit from any implementation of the Deal in the marketplace.

103.    It was reasonable for KCP to expect that Henkel US would close on the Technology Distribution Deal.  Specifically, after months of negotiations and almost daily revisions made to the Distribution Agreement by early 2015, the terms of the Deal had become certain, specific, and but for Henkel KGaA's sinister plan to circumvent KCP, would have been finalized and the Distribution Agreement executed.

104.    Unbeknownst to KCP at the time, once Henkel KGaA determined that the Project should be global, and not just a pilot project in North America, KCP's deal with

35

Henkel US was doomed.  While KCP initially deemed it beneficial that Henkel KGaA became involved in the Project, it was Henkel KGaA's duplicity and deceit, intentionally engaged in by Berthod, and later condoned by Perkins, that destroyed KCP's interest and investment in the entire Project.

105.   Indeed, believing that Henkel KGaA was negotiating in good faith, KCP was more than accommodating to Henkel KGaA and Henkel US during negotiations, specifically including, but without limitation: disclosing the  identity of its technology partner, AIS; providing direct access to its blender, Magnablend; facilitating a demonstration of the Technology at Henkel KGaA's request; meeting with and marketing to customers; and granting a number of concessions regarding the terms of the Distribution Agreement.

106.   KCP relied upon the validity of the parties' NDA to conduct business with Henkel US and Henkel KGaA.

107.   Through the very existence of the NDA, Henkel KGaA agreed that KCP's interest in maintaining the confidentiality of the information KCP disclosed (including the identity of AIS) was more important than Henkel KGaA's desire to use that information to further its own business interests.

108.   Regardless, despite all of KCP's efforts, without which, Henkel KGaA would not have even known about the Technology, and certainly would not have developed a practical use for it, Henkel KGaA simply side-stepped the promises made in a binding NDA and started directly communicating with AIS.  Hindsight being 20/20, signs existed

that Henkel KGaA (through Berthod) and AIS were communicating as early as mid-March 2015—even before AIS terminated its Exclusive Licensing Agreement with KCP. Such signs include but may not be limited to:

a. Berthod had reviewed in detail the Exclusive License Agreement between AIS and KCP as part of Henkel KGaA's negotiations with KCP. Thus, Henkel KGaA, and specifically Berthod, ceased communicating with KCP and started pursuing AIS directly (a relationship he desired from the beginning) at the same time that Berthod <u>knew</u> that the deadline for KCP's License Agreement with AIS had expired and could be terminated under its terms.

b. Henkel KGaA deliberately stalled and delayed finalizing the Distribution Agreement between Henkel US and KCP. This is especially true during the timeframe **after** the successful March 3-4, 2015 meeting at Henkel KGaA's headquarters in Germany when Berthod repeatedly assured KCP that the Project was moving forward, and that Jan-Dirk Auris had approved KCP's $3.5 Million upfront payment.

c. During the March 3-4, 2015 meeting, Berthod expressed displeasure over the percentage KCP would receive from the profits made from execution of the Technology Distribution Deal. Indicating he believed that KCP was disposable should Henkel KGaA have direct access to the Technology,

Berthod rhetorically asked Fadi Nona: "What does Henkel need from you now?"

d.  Henkel KGaA pushed for direct relationships with Magnablend and AIS. Magnablend remained loyal to KCP, but KCP was still willing and able to negotiate a secondary "clone" agreement guaranteeing a relationship with Magnablend should KCP somehow not be part of the partnership. Had Henkel KGaA meant to finalize the Deal with KCP, it would not have needed the direct relationships it sought with Magnablend and AIS.

e.  Henkel KGaA went "radio silent" in April 2015, the same month that AIS terminated its Exclusive License Agreement with KCP. It is not a coincidence that AIS terminated the agreement on April 17, 2014 and on April 18, 2014 Berthod again ceased virtually all substantive communication with KCP.

f.  Henkel KGaA's internal communications and documents received by KCP after June 5, 2015 demonstrate that Henkel KGaA was attempting to obtain the Technology from AIS and intended to proceed with the Project without KCP—by just substituting AIS for KCP as the Technology licensor.  Thus, as Berthod planned, Henkel KGaA ruthlessly "eliminated the middle-man" in order to attempt to obtain a bigger share of the Deal's profits.

109.   Berthod (and thus Henkel KGaA) knew that he was breaching Henkel's NDA with KCP when he directly contacted AIS.

38

110.   Berthod (and thus Henkel KGaA) purposefully, with malice, and in bad faith breached Henkel's NDA to have a direct relationship with AIS which directly harmed KCP—to "cut out the middle man" as Berthod (erroneously) perceived KCP to be.

111.   Berthod (and thus Henkel KGaA) knew—and intended—that Henkel KGaA's violation of the NDA and direct relationship with AIS would result in significant harm to KCP.   Indeed, Berthod outright admitted he intended to oust KCP from the Project ("What does Henkel need from you now?") but also that he would deal directly with AIS because it was purportedly in Henkel KGaA's "best interests."

112.   Berthod (and thus Henkel KGaA) intended for KCP to be harmed by his breach of the NDA.

113.   Henkel KGaA's actions, undertaken in violation of the parties' NDA, constitute a per se wrongful act and cannot be justified as furthering Henkel US's legitimate profit seeking activities or business interests.   Berthod's intentional breach of the NDA was not in service of Henkel US' financial interests (who also suffered harm)—but done to usurp all the profits for Henkel KGaA, and to deprive KCP of any payment by ousting KCP from the Project.

114.   Berthod (and thus Henkel KGaA) knowingly and intentionally interfered with KCP's business expectancy with Henkel US.

115.   When the Project was assumed by Henkel KGaA, Henkel US also lost the opportunity to pursue the Distribution Deal and Henkel US employees were denied significant financial benefits in the form of compensation and potential bonuses from the

39

Deal. Henkel KGaA's actions therefore did not serve an interest in the profit-maximizing activities of Henkel US. To the contrary, Henkel KGaA's actions caused Henkel US to be unable to close the Technology Distribution Deal—which, without Berthod's (and thus, Henkel KGaA's) bad faith interference, Henkel US would have been able to do.

116.   KCP had a specific and reasonable prospective economic advantage in its business relationship with Henkel US that was interfered with by Henkel KGaA. Specifically, through commandeering negotiations away from its indirect subsidiary Henkel US, violating its valid and binding NDA, and directly negotiating with AIS, Henkel KGaA interfered with KCP's valid business expectancy in the Technology Distribution Deal.

117.   KCP has been damaged by Henkel KGaA's actions and is entitled to damages in the amount of the value of the contract in the amount of at least $100 Million. KCP is also entitled to recoup all of its actual costs and expenses expended in pursuit of the Distribution deal in an amount of over $1,000,000.

## COUNT II
## Breach of the Henkel NDA

118.   KCP restates and realleges its prior allegations herein.

119.   Henkel KGaA approached AIS to obtain the Technology directly.

120.   At the time that Henkel KGaA contacted AIS, it was bound by the valid and binding NDA Henkel US executed with KCP that prevented it from using any information or relationships it obtained through negotiations of the Distribution Deal.

121.   KCP relied upon the validity of the parties' NDA to conduct business with Henkel US and Henkel KGaA.

122. Through the very existence of the NDA, Henkel KGaA agreed that KCP's interest in maintaining the confidentiality of the information KCP disclosed (including the identity of AIS) was more important than Henkel KGaA's desire to use that information to further its own business interests.

123. Henkel KGaA, through Berthod, wrongfully and intentionally breached Henkel's NDA with KCP and wrongfully used KCP's confidential information—which KCP would not have disclosed but for the NDA—to seek a direct deal with AIS, purportedly for Henkel's benefit. This breach by Henkel KGaA directly and proximately caused KCP to lose the opportunity to close the Distribution Deal with Henkel US. Put simply, if not for Henkel KGaA's breach of the NDA, Henkel US would have closed the Distribution Deal with KCP.

124. Henkel KGaA, intentionally breached its NDA to obtain the Technology directly from AIS and specifically to destroy KCP's interest and position in the Distribution Deal and deprive KCP of any profits it was entitled to through the Distribution Deal.

125. Indeed, Berthod, on behalf of KGaA admittedly breached Henkel's NDA with KCP to oust KCP, who he perceived to be the "middle man."

126. KCP has been damaged by Henkel KGaA's actions and is entitled to damages in the amount of the value of the contract in the amount of at least $100 Million. KCP is also entitled to recoup all of its actual costs and expenses expended in pursuit of the Distribution deal in an amount of over $1,000,000.

## CONCLUSION AND PRAYER FOR RELIEF

WHEREFORE, KCP respectfully requests that this honorable court enter judgment in favor of KCP and against Henkel KGaA granting such relief as is appropriate and just, including without limitation, awarding an amount of at least $100 Million in damages with interest accumulating thereon to KCP as well as awarding KCP its actual costs and expenses expended in pursuit of the Distribution deal in an amount of over $1,000,000.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

Respectfully submitted,
KICKHAM HANLEY PLLC

By: /s/ Jamie Warrow
Gregory D. Hanley (P51204)
Jamie K. Warrow (P61521)
Edward F. Kickham Jr. (P70332)
Counsel for Plaintiff
32121 Woodward Ave, Suite 300
Royal Oak, Michigan 48073
Tel: 248.544.1500
jwarrow@kickhamhanley.com

Dated: June 3, 2016

## CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2016, I electronically filed the foregoing pleading with the Clerk of the Court using the court's electronic filing system.

/s/ Kim Plets
Kim Plets

KH146546

42