# EXHIBIT - C

# TRADE SECRET & TECHNOLOGY LICENSE AGREEMENT

THIS TRADE SECRET & TECHNOLOGY LICENSE AGREEMENT ("Agreement") is dated **November 5, 2014** ("Effective Date"), and is between AI SEALING, L.L.C. (AIS) organized under the laws of Texas ("Licensor"), and Knight Capital Partners Corporation (KCP) a Michigan corporation ("Licensee"). Throughout this agreement LICENSOR and LICENSEE are sometimes hereinafter collectively referred to as the "Parties" and singularly as a "Party".

## RECITALS:

LICENSOR has developed and is the owner or has the right to license certain proprietary trade secrets and technology, together with associated expertise, technical information and know-how and other confidential information, regarding formulas, recipes and processes used in industrial, consumer, manufacturing, healthcare, and other applications foreseen or unforeseen or discovered or undiscovered, all as further listed and described in detail in **Exhibit A** (the "Technology"); and LICENSEE acknowledges and understands that the formulations listed in Exhibit A, may be the result of collaboration with other 3rd parties and/or raw material suppliers.

LICENSEE desires to utilize and sublicense the Technology globally as stated in Article 1 below, for any purpose it deems applicable, including but not limited to: manufacturing, sale, use, distribution, marketing and development of Technology, and to make the Technology available to its customers for their use in the processes as deemed appropriate by LICENSEE in order to sell and/or sublicense to one or more of its affiliates, and/or any 3rd parties.

NOW, THEREFORE, in consideration of the premises and the mutual covenants set forth in this Agreement, the Parties agree as follows:

## 1. LICENSE

a) Subject to the payment of the Royalties and Guaranteed Payments provided in Article 3 and the fulfillment of all of the other terms and conditions of this Agreement, LICENSOR shall grant to LICENSEE at Closing a, worldwide right and exclusive license to use and commercialize the Technology (to the full extent of the rights it has and except with respect to LICENSOR) during the Term (the "License"). The License includes, but is not limited to, the right to manufacture or have made, sell, distribute, use, market, develop and commercialize any and all embodiments of, or improvements to, the Technology that are developed, discovered, or acquired by LICENSOR during the Term, except as provided in subsection (c) herein.

b) The LICENSEE may grant sublicenses to third parties under the License, not exceeding the scope of the License granted in Section 1(a); provided that (i) the grant of a sublicense shall not relieve LICENSEE of any of its obligations, duties, or limitations under this Agreement; (ii) any action or omission of a sublicensee shall have the same consequence or effect as if such action was LICENSEE's own; and (iii) any sublicensee agreement shall contain a confidentiality obligation, binding on the sublicensee, which is comparable to the confidentiality provision of this Agreement, at Section 14.

c) Notwithstanding the other provisions of this Article 1, LICENSOR retains all rights to manufacture or have made, sell, distribute, use, market, and commercialize any and all

- 1 -

Initials: [signatures]

embodiments of, or improvements to, the Technology to its existing and new clientele without restriction. LICENSOR shall not sell or otherwise transfer ownership of the formula for Bioguard during any Term of this Agreement. LICENSEE shall not be entitled to any proceeds received by LICENSOR from any of LICENSOR'S existing and new clientele serviced by LICENSOR.

d) LICENSOR may request for LICENSEE to service any existing and/or new clientele of LICENSOR and upon approval of LICENSEE, LICENSOR shall then be entitled to the additional compensation for referred business in the amount of an additional $0.10 per gallon sold as provided for below and in **Exhibit B** (Agency Agreement).

2. **LICENSE RESTRICTIONS**

a) LICENSEE agrees that it will not itself, or through any parent, subsidiary, affiliate, agent or third party, (i) sell, use, lease, license, sublicense or encumber any portion of the Technology except as expressly permitted in this Agreement; or (ii) disassemble or reverse engineer any portion of the Technology, unless and to the extent required under national law.

b) If and to the extent that LICENSEE grants rights to any third party under a sublicense, LICENSEE shall ensure that the same (or greater) restrictions apply to each permitted sublicense, including without limitation a term and termination rights specifying that the sublicense shall be terminated upon expiration or termination of this Agreement, except as provided for in Article 17 (Option to Purchase).

3. **COMPENSATION**

In consideration for the License, LICENSEE agrees to pay to LICENSOR the compensation as provided below:

a) <u>Royalty</u>. LICENSEE shall pay LICENSOR a royalty in the amount of ten cents ($0.10) per gallon for all products Sold by Licensee under this Agreement, whether, Sold by LICENSEE or by a permitted sublicensee of LICENSEE, for the duration of the Agreement. The method and timing of LICENSEE's reporting and payment of Royalties is further described in Section 4(a).

b) <u>Additional Royalty on Referred Business</u>. LICENSOR may, at LICENSOR's sole discretion but subject to acceptance by LICENSEE, refer existing business opportunities to LICENSEE to allow LICENSEE to make, have made, distribute, or sell products based on the Technology to end user customers of LICENSOR ("Referral Customers"). If LICENSEE provides products or services to Referral Customers, then LICENSEE shall pay LICENSOR an additional royalty in the amount of ten cents ($0.10) per gallon for all products Sold, by LICENSEE under this Agreement, products Sold by LICENSEE or by a permitted sublicensee of LICENSEE, for the duration of the Agreement (i.e., LICENSEE business to Referral Customers shall bear a total royalty rate of twenty cents ($0.20) per gallon), and be subject to **Exhibit B** (Agency Agreement).

c) <u>Minimum Annual Royalty Commitment</u>. The total of all royalties paid by LICENSEE to LICENSOR under this Agreement shall be no less than Twenty Million Dollars ($20,000,000.00) in any one-year period during the Term. If, upon any anniversary of the Effective Date, LICENSEE has failed to pay royalties to LICENSOR totalling at least $20,000,000.00 in the immediately preceding one-year period, then LICENSEE shall immediately pay to LICENSOR the remainder of the Minimum Annual Royalty Commitment as an Annual Guaranteed Payment. (The amount of the Annual Guaranteed

Initials: [signatures]

- 2 -

Payment shall be the difference between (i) $20,000,000.00 and (ii) the royalties paid during the previous one year.) Notwithstanding the foregoing, if at any time during the performance of this Agreement LICENSEE has paid to LICENSOR total aggregate payments totalling One Hundred Million Dollars ($100,000,000.00) in any combination of royalties, advances, Minimum Annual Royalties, or Annual Guaranteed Payments, then no additional Minimum Annual Royalty Commitments shall apply for the remainder of this Agreement.

d) <u>First Year Abatement</u>. So long as LICENSEE is in compliance with all other terms and conditions of this Agreement, LICENSOR agrees to a one-time abatement of royalties at the beginning of the initial Term, so that LICENSEE shall not pay any Royalty or Additional Royalty until LICENSEE has first achieved sales or licenses under this Agreement that would otherwise result in Royalties due to LICENSOR of One Million Five Hundred Thousand Dollars ($1,500,000.00). The Royalties subject to this abatement shall be reported to LICENSOR as required under Section 4 of this Agreement, but not subject to payment. The abatement amount does not reduce or otherwise affect the amount of the Minimum Annual Royalty Payment under Section 3(c).

e) <u>First Term Guaranteed Payment</u>. LICENSEE guarantees to pay LICENSOR at least One Hundred Million Dollars USD ($100,000,000.00) within the initial Term (the "First Term Guaranteed Payment").

f) The Annual Guaranteed Payments and the Term Guaranteed Payment shall be subject to and protected by the payment guarantees in Section 6 of this Agreement.

## 4. ROYALTY REPORTING, INVOICES, AND PAYMENTS

(a) During the Term of this Agreement, LICENSEE will provide to LICENSOR a detailed written report no later than thirty (30) business days after the end of each quarter, covering all business sales and other royalty obligations under this Agreement during the previous quarter (the "Quarterly Royalty Report"). Each Quarterly Royalty Report shall include, at a minimum, the following items: (i) the total amount of gallons Sold or its equivalent with respect to each product Sold; (ii) the product name and product SKU; and (iii) LICENSEE'S payments due to LICENSOR for the reported quarter, based on the reported volumes, the royalty rate ($0.10/gallon), and the additional royalty rate on any business referred by LICENSOR pursuant to the Section 3(b), and the Agency Agreement as provided for in Exhibit B, if any. For purposes of this Section and the applicable reports, "Sold" includes any internal sales and means that payment or other credit has been reported to or received by LICENSEE.

(b) At the same time that LICENSEE provides the Quarterly Royalty Report to LICENSOR, but in no event later than thirty (30) business days after the end of each quarter, LICENSEE shall pay the full amount of any royalty payment due to LICENSOR for the previous quarter. The royalty payment shall be made by wire transfer or ACH transfer to LICENSOR's designated bank account. All amounts must be paid in U.S. Dollars, without deduction of any kind or for any taxes, assessments, fees, or charges.

(c) LICENSEE'S obligation to pay LICENSOR Royalties under this Section 4 is based and contingent on LICENSEE'S receipt or collection of payment or other credit from its customers or sublicensees.

- 3 -

Initials: [signature]

(d) All fees paid are non-refundable. All amounts not paid when due are subject to a late payment fee of 1%.

## 5. ESTIMATED CONTRACT VALUE.

(a) LICENSEE guarantees to pay LICENSOR a total amount of Five Hundred Million U.S. Dollars $500,000,000.00 within the Term of the Agreement, which will be derived from the aggregate of the Royalties and Guaranteed Payments listed above as provided for in Section 3 herein and shall trigger LICENSEE's option to purchase as provided for Section 17.

b) LICENSEE guarantees to pay LICENSOR a maximum, cumulative amount of One Billion, One Hundred Million U.S. Dollars $1,100,000,000.00 within the Renewal Term of the Agreement (Years 6 through 10), which will be derived from the aggregate of the Royalties and Guaranteed Payments listed above.

c) LICENSEE shall be granted a sixty (60) day grace period to pay any Guaranteed Payment when due. If LICENSEE fails to pay any Guaranteed Payment within the grace period then LICENSEE shall pay LICENSOR a penalty of one percent (1%) of what is due and owing.

## 6. PAYMENT GUARANTEES

a) As a condition of Closing, LICENSEE will obtain certified pass-through of guarantees from Henkel to LICENSOR guaranteeing LICENSEE's obligations to LICENSOR under this Agreement, including, but not limited to, the Guaranteed Payments.

b) LICENSEE shall provide immediate notice to LICENSOR upon any change to or event affecting the validity of any of the payment guarantees described in this Section 6. If any change or event affects or in the sole opinion of LICENSOR is likely to affect the identity, validity, or enforcement of any form of guaranty required by this section, such adverse event shall be considered a material breach of this Agreement by LICENSEE, and LICENSOR may terminate the Agreement subject to LICENSEE's ability to cure the default by providing an alternative acceptable guaranty within Sixty (60) days from such event.

## 7. CLOSING; CLOSING CONDITIONS

(a) Unless this Agreement is earlier terminated pursuant to Section 15, and subject to the conditions set forth in Section 7(d) and 7(e), the Closing of the transaction contemplated hereby shall occur at the offices of _____ no later than sixty (60) days after the Effective Date, or at such other time and place as may be mutually agreed by the Parties (the "Closing Date"). The Parties may agree to conduct the Closing without a physical meeting, by exchange of executed documents prior to the Closing Date, as permitted under Section 24(g).

(b) At or before Closing, LICENSOR shall deliver, or cause to be delivered, to the LICENSEE, the following:

(1) The Technology, including any documentation of formulas, products, and processes necessary to fulfill the License attached as Exhibit A;

(2) The Agency Agreement, in the form attached as Exhibit B;

- 4 -

Initials: _____

(3) The Mutual Non-Disclosure Agreement, executed by both Parties; and

(4) Any additional documentation required by LICENSEE or any sublicensee to complete any obligation of LICENSEE under this Agreement.

(c) At or before Closing, LICENSEE shall deliver, or cause to be delivered, to the LICENSOR, the following:

(1) The Agency Agreement, in the form attached as Exhibit B;

(2) Documentation or certification sufficient to demonstrate the existence of an executed sublicense between LICENSEE and Henkel Corporation, a division of Henkel AG & Co., KGaA;

(3) The Payment Guarantee (in the form of a certified pass-through guarantee or such other form acceptable to LICENSOR), as required by Section 6(a) of this Agreement;

(4) The Mutual Non-Disclosure Agreement, executed by both Parties; and

(5) Any additional documentation required by LICENSOR to complete any obligation of LICENSOR under this Agreement.

(d) The obligations of LICENSOR to consummate the transaction contemplated by this Agreement shall be subject to the satisfaction by LICENSEE of the following conditions prior to Closing:

(1) All representations and warranties of LICENSEE in this Agreement shall be true and correct in all material respects as of the Closing Date with the same effect as though such representations and warranties had been made on and as of such date; and all of the terms, covenants and conditions of this Agreement to be complied with or performed in all material respects;

(2) There shall be no pending or threatened litigation or administrative proceeding seeking to restrain, enjoin or otherwise prevent the consummation of the transactions contemplated by this Agreement; and

(3) LICENSEE shall have delivered all documents, agreements, or certificates required to be delivered, and taken all actions required, in each case, as required by LICENSOR under this Agreement.

(e) The obligations of LICENSEE to consummate the transaction contemplated by this Agreement shall be subject to the satisfaction by LICENSOR of the following conditions prior to Closing:

(1) All representations and warranties of LICENSOR in this Agreement shall be true and correct in all material respects as of the Closing Date with the same effect as though such representations and warranties had been made on and as of such date; and all of the terms, covenants and conditions of this Agreement to be complied with or performed in all material respects;

(2) There shall be no pending or threatened litigation or administrative proceeding seeking to restrain, enjoin or otherwise prevent the consummation of the transactions

Initials: [signature]

- 5 -

contemplated by this Agreement; and

    (3) LICENSOR shall have delivered all documents, agreements, or certificates required to be delivered, and taken all actions required, in each case, as required by LICENSEE under this Agreement.

## 8. REPRESENTATIONS AND WARRANTIES OF LICENSOR

LICENSOR, on behalf of itself and its affiliates, represents and warrants to LICENSEE the following:

    a) LICENSOR is a limited liability company duly organized and in good standing under the laws of the State of Texas, United States of America. The execution of this Agreement by LICENSOR has been duly authorized by all necessary action, and constitutes a valid and binding obligation of LICENSOR, enforceable against LICENSOR in accordance with its terms (subject to applicable law). Neither LICENSOR nor any of its affiliates are party to any contract, obligation or agreement of any kind or nature that would prohibit LICENSOR from entering into this Agreement or fulfilling its obligations hereunder, or for which the granting of the License will cause a default or breach of such contract, obligation or agreement.

    b) LICENSOR is the owner or has the right to license the Technology, as described in further detail above and in **Exhibit A**. Some of the Technology may include products or information of third parties, available commercially or provided under license. All such third party content is fully disclosed in **Exhibit A**. There are no liens, mortgages, encumbrances, or other agreements that would impair or prevent the exercise by LICENSEE of the rights granted to it under this Agreement. LICENSOR has not assigned, transferred, or otherwise conveyed any right to practice the Technology to any third party.

    c) To LICENSOR's knowledge and belief, without independent investigation, LICENSEE'S use or commercialization of the Technology pursuant to the License does not infringe, or constitute a misappropriation of, any intellectual or industrial property right of any third party. LICENSOR has complied with all applicable laws and regulations required to (i) preserve and secure its rights in and to the Technology, and (ii) grant the License as contemplated by this Agreement.

    d) LICENSOR has complied with all applicable laws and regulations, including without limitation the United States Environmental Protection Agencies (EPA) rules and regulations.

    e) Both Parties acknowledge that the Technology is intended for use in the oil and gas fracking and refinery maintenance industries. All parties understand that each end user's site conditions may require additional product modification to fit the exact customer conditions and that end user will have to be the final approver of technology efficacy for their intended application.

    f) LICENSOR is not aware of any personal injury, death or property damage or cause of action or potential cause of action that has resulted from the use of the Technology or any products manufactured or sold using the Technology.

## 9. REPRESENTATIONS AND WARRANTIES OF LICENSEE

LICENSEE, on behalf of itself and its affiliates, represents and warrants to LICENSOR the following:

Initials: _[signatures]_

-6-

a) LICENSEE is a corporation, duly organized and in good standing under the laws of the State of Michigan, United States of America. The execution of this Agreement by LICENSEE has been duly authorized by all necessary action, and constitutes a valid and binding obligation of LICENSEE, enforceable against LICENSEE in accordance with its terms (subject to applicable law). Neither LICENSEE nor any of its affiliates are party to any contract, obligation or agreement of any kind or nature that would prohibit LICENSEE from entering into this Agreement or fulfilling its obligations hereunder, or for which the granting of the License will cause a default or breach of such contract, obligation or agreement. LICENSEE is debt free and there are no liens, mortgages, encumbrances, or other agreements that would impair or prevent LICENSEE from fulfilling its rights or obligations under this Agreement.

b) LICENSEE has complied with all applicable laws and regulations required for it to enter into this Agreement and to use or commercialize the Technology.

## 10. COVENANTS OF LICENSOR.

LICENSOR will do all of the following:

a) take all steps necessary or advisable to preserve its rights in and to the Technology, and the rights of LICENSEE under the License, and refrain from taking any action that would impair or limit any such rights;

b) at its own expense, maintain and protect its ownership and protection of the Technology;

c) refrain from challenging, or assisting any third party in challenging, the validity of any of LICENSEE'S use of the Technology, or any patent or other intellectual property rights included in the Technology, and cooperate with LICENSEE in (i) defending any claim of infringement raised by any third party to any trade secrets and technology or patents or other intellectual property rights included in the Technology, or (ii) prosecuting an action against any third party for the infringement of any such rights;

d) promptly notify LICENSEE of any enhancements or improvements to the Technology which LICENSOR develops or of which LICENSOR becomes aware;

e) use commercially reasonable best efforts to respond to LICENSEE's reasonable requests for technical, educational, blending, manufacturing, marketing, training, documentation and other instruction regarding the Technology in a careful and diligent manner to LICENSEE or any Sublicensee designated by LICENSEE for the term of the Agreement, including onsite instruction upon no less than seven (7) days notice and subject to travel restrictions and expense reimbursement as further provided herein, and LICENSOR will use its commercially reasonable best efforts to respond and provide technical assistance to LICENSEE or designated Sublicensee;

f) LICENSOR will provide analysis and reformulate Technology to maximize performance for differing customer application conditions on an expedited basis, and will provide a written response to LICENSEE within seven (7) days if a response cannot be returned within fourteen (14) days from delivery confirmation of sample which will be sent via certified mail by LICENSEE.

g) LICENSEE upon reasonable notice to LICENSOR may from time to time require LICENSOR to provide and perform onsite training, assistance or modifications to the Technology, for which most travel shall be limited to Texas and Michigan, however in

-7-

Initials: _____

limited circumstances LICENSOR may be required to travel outside of the United States. LICENSEE will pay for any and all travel expenditures relating to required travel.

    h)    LICENSOR will timely assist upon request of LICENSEE in seeking to obtain EPA sub-registrations for Biocide for use by LICENSEE.

    i)    ensure the timely payment of any and all taxes, fees, duties and other payments owed by it in connection with the manufacture, use and sale of the systems and methods of the Technology, or by virtue of its ownership of any patents or other intellectual property rights associated with the Technology, and obtaining all necessary governmental approvals in order to perform its obligations under this Agreement.

    j)    comply with all applicable laws, regulations and rules concerning the production, use, marketing, distribution and sales of the Technology by LICENSOR, including but not limited to any requirements relating to (i) export compliance relating to sales or distribution by LICENSOR, and (ii) patent marking provisions or similar requirements under the intellectual property laws of any applicable country relating to sales or distribution by LICENSOR;

    k)    at all times during the Term, maintain at its sole cost and expense insurance coverage from a reputable insurance company reasonably acceptable to LICENSEE to cover commercial general liability, including product liability, on an occurrence basis with a combined single limit of not less than USD $1,000,000 (or equivalent foreign currency). LICENSOR will provide upon request certificates evidencing such insurance, including the obligation that its insurance carriers will not cancel or materially amend such policies without thirty (30) days written notice to LICENSEE.

    l)    LICENSOR will use commercially reasonable best efforts to assist LICENSEE with knowledge and information to support LICENSEE's efforts to secure and transfer certain knowledge and actual raw material supply continuity from third parties as needed by LICENSEE.

## 11. COVENANTS OF LICENSEE.

LICENSEE will do all of the following:

    a)    take all steps necessary or advisable to preserve its rights and the rights of LICENSOR in and to the Technology, and its rights under the License, and refrain from taking any action that would impair or limit any such rights;

    b)    refrain from challenging, or assisting any third party in challenging the validity of any patent or other intellectual property rights included in the Technology, and cooperate with LICENSOR in (i) defending any claim of infringement raised by any third party to any patents or other intellectual property rights included in the Technology, or (ii) prosecuting an action against any third party for the infringement of any such rights;

    c)    ensure the timely payment of any and all taxes, fees, duties and other payments owed by it in connection with the License or its use of the Technology, including the manufacture, use and sale of systems and methods embodying the Technology, and obtaining all necessary governmental approvals in order to perform its obligations under this Agreement;

    d)    comply with all applicable laws, regulations and rules concerning the production, use, marketing, distribution and sales of the Technology, including but not limited to any requirements relating to (i) export compliance, customs, and trade regulations; (ii) patent marking provisions or similar requirements under the intellectual property laws of any

- 8 -

Initials: _____

applicable country; (iii) export controls and other trade restrictions of the United States or any other country the laws of which apply to any sale, license, or sublicense under this Agreement; and (iv) regulatory, environmental, consumer protection, or other laws or regulations of any country, state, or locality applicable to the sale, license, manufacture, or distribution of products under this Agreement, including any requirements for permits, licensing, marking of products, or other requirements; and

e) at all times during the Term, maintain at its sole cost and expense insurance coverage from a reputable insurance company reasonably acceptable to LICENSOR to cover the following: (i) commercial general liability, including product liability, or umbrella excess liability on an occurrence basis with a combined single limit of not less than USD $1,000,000 (or equivalent foreign currency), and (ii) workers' compensation insurance in compliance with any applicable law. LICENSEE will provide upon request certificates evidencing such insurance, including the obligation that its insurance carriers will not cancel or materially amend such policies without thirty (30) days written notice to LICENSOR. In addition, LICENSOR, along with its officers, directors, employees, and shareholders, shall be named as an additional insured with respect to the commercial general liability policy. The applicable policies must provide protection against all claims, demands, and causes of action arising out of any defects or failure to perform, alleged or otherwise, of products manufactured using the Technology, or any use thereof.

f) LICENSEE will not sell Knight Capital Partners during the Term of the Agreement and will not assign the same except for as provided in Section 24(c) herein.

g) LICENSEE Agrees to assign the sublicense agreement between LICENSEE and Henkel AG & Company (the "Henkel Sublicense") upon LICENSEE filing bankruptcy under Chapter 11 of the United States Bankruptcy Code.

## 12. QUALITY CONTROL AND QUALITY ASSURANCE

a) LICENSEE shall provide, at the request of LICENSOR but no less often than twice each year, product samples of all products sold, manufactured, or distributed by LICENSEE, either directly or under a sublicense, for purposes of quality review and control.

b) LICENSOR may, with 30 days written notice to LICENSEE, visit any site at which LICENSEE or any permitted sublicensee is manufacturing, distributing, or selling any product based on the Technology and take a random sample of the product for testing, provided that this random sampling shall not occur more than once at the same location within the same calendar year (unless the first sample shows a problem with the quality or safety of the product). LICENSOR shall pursue any quality control and quality assurance inquiries at their own expense.

## 13. INDEMNIFICATION

a) LICENSOR to the fullest extent provided by law shall indemnify, defend and hold harmless LICENSEE, its officers, directors, employees, attorneys, agents, representatives, successors and affiliates from and against any and all liabilities, damages, claims, causes of action, and liens incurred by LICENSEE as the result of (i) the breach by LICENSOR of any of its representations or warranties in Section 8, or (ii) the failure of LICENSOR to comply with any of its obligations under Section 10 (each a "Claim"), and will reimburse LICENSEE for all costs, expenses, damages, awards or judgments, including reasonable attorneys' fees in connection with any such Claim.

- 9 -

Initials: _____

b) LICENSEE will indemnify, defend and hold harmless LICENSOR, its members, officers, directors, employees and affiliates from and against any and all liabilities, damages, claims, causes of action, and liens incurred by LICENSOR as the result of (i) the breach by LICENSEE of any of its representations or warranties in Section 9, or (ii) the failure of LICENSEE to comply with any of its obligations under Section 11 (each a "Claim"), and will reimburse LICENSOR for all costs, expenses, damages, awards or judgments, including reasonable attorneys' fees in connection with any such Claim.

c) Each party's indemnification obligations under this Section are subject to the following conditions:

(i) the party seeking indemnity ("Indemnified Party") must give written notice to the other party ("Indemnifying Party") promptly upon becoming aware of any claim for which it intends to seek indemnity under this Section; and

(ii) the Indemnifying Party must be allowed to control the defense of the Claim, and the Indemnified Party must provide information and otherwise cooperate with the reasonable requests of the Indemnifying Party in defending the Claim.

d) The Indemnified Party will have the right to, at its own expense, engage separate counsel and to be kept informed of the status of any such Claim.

e) The Indemnifying Party will not enter into a settlement or compromise agreement for any Claim which contains any admission of wrongdoing by the Indemnified Party, or which would obligate the Indemnified Party to take or refrain from any material action, without the consent of the Indemnified Party.

## 14. CONFIDENTIALITY

a) Each of the parties acknowledges and agrees that during the Terms of this Agreement and thereafter, it may receive confidential and proprietary information regarding the business, technology, and operations of the other party, including but not limited to the Technology, the existence and terms of this Agreement and the Letter of Intent (collectively, "Confidential Information"). Except as otherwise agreed in writing, each of the parties agrees to maintain the confidentiality of other party's Confidential Information and not disclose it to any third party, and to use the Confidential Information only in furtherance of the purpose of this Agreement.

b) Each party will use the same degree of care in protecting the other party's Confidential Information as it uses to protect its own confidential information, and will not disclose the Confidential Information except to those of its employees, agents and representatives who need to know such information in furtherance of this Agreement, and which are bound by obligations of confidentiality and non-disclosure comparable to those herein.

c) Notwithstanding the foregoing, Confidential Information will not include any information which:

(i) is, or later becomes, generally available to the public;
(ii) is subsequently received from a third party with the legal right to disclose;
(iii) was already in the possession of the recipient at the time of its disclosure; or
(iv) is independently developed by the recipient without reliance on the use of, or access to, the Confidential Information.

The party invoking any of the foregoing exceptions will have the burden of proving by competent evidence the applicability of such exception.

- 10 -

Initials: _____

d) The provisions of this Section 14 do not preclude LICENSEE from sharing with any Manufacturer, Distributor or Sublicensee covered by Section 1(b), any information relating to the Technology, or any patent, trade secret or other intellectual property right related thereto, to the extent necessary for the practice by that Manufacturer, Distributor or Sublicensee of the License and/or the Technology, provided that the Manufacturer, Distributor or Sublicensee is bound by equivalent obligations of confidentiality and the terms of this Agreement are not otherwise breached.

e) Both Parties agree that the Technology and the terms of this Agreement, will not be divulged, shared or discussed with any third party not privy to this Agreement, and that any such disclosures of the Technology will cause irreparable harm to the other Party.

f) Parties agree that the Unilateral Confidentiality Agreement (UCA) executed between the Parties on February 13, 2014 shall remain in full force and effect for the duration of the Agreement as provided in Exhibit C and that the UCA will control upon the finding of any ambiguity between section 8, Exhibit E and the UCA.

g) In addition to the UCA, a Mutual Non-Disclosure Agreement will be executed contemporaneously with this agreement as provided for in Exhibit D.

## 15. TERM AND TERMINATION

a) This Agreement shall be effective as of the Effective Date and shall continue until the date that is five (5) calendar years from the Effective Date (the "Term"), unless earlier terminated pursuant to this section. The Term shall be automatically renewed for an additional five (5) year Term (the "Renewal Term") under the same provisions and covenants herein unless LICENSEE provides notice to LICENSOR to exercises its option to terminate the Agreement no less than 60 days prior to the expiration of the initial five (5) year Term.

b) The Agreement may be terminated and the transactions contemplated by this Agreement abandoned at any time prior to the Closing:

(1) by mutual written consent of the LICENSOR and LICENSEE;

(2) by either LICENSOR or LICENSEE, if the Closing does not occur on or prior to sixty (60) days after the Effective Date (the "Closing Deadline") unless extended by mutual agreement of the Parties;

(3) by LICENSOR, if the conditions set forth in Section 7(d) have not been satisfied or waived on or before the Closing Deadline; or

(4) by LICENSEE, if the conditions set forth in Section 7(e) have not been satisfied or waived on or before the Closing Deadline.

c) At any time upon LICENSEE paying to LICENSOR the aggregate sum of One Billion One Hundred Million Dollars ($1,100,000,000.00 USD), LICENSOR will not be entitled to any further Royalties and upon LICENSEE's request to assume ownership of LICENSOR, will promptly effectuate appropriate documents transferring the ownership of AI Sealing, its subsidiaries and the Technology (pursuant to Section 17) and any governmental registrations and/or sub-registrations required.

d) After the Closing, this Agreement may be terminated by either Party, following a material breach by the other Party of its obligations under this Agreement which remains uncured for more than thirty (30) days after notice by the non-breaching Party, or any material breach of the Unilateral Confidentiality Agreement executed on February 13, 2014, or the Mutual Non-Disclosure Agreement delivered at Closing;

- 11 -

Initials: [signature]

e) After the Closing, this Agreement may be terminated by either Party immediately, if the other Party:

(i) is determined by a court of competent jurisdiction to be insolvent, or is generally failing to pay its debts as they come due;

(ii) voluntarily ceases to conduct its business in the ordinary course;

(iii) voluntarily files a petition for bankruptcy or similar proceeding, or has such a proceeding filed against it which is not dismissed or withdrawn within sixty (60) days;

(iv) makes a voluntary assignment for the benefit of creditors;

(v) has a receiver appointed over all or any part of its assets; or

(vi) by either party, if non-performance of obligations of the other Party due to a Force Majeure event continues for longer than 180 days.

## 16. EFFECTS AND OBLIGATIONS UPON TERMINATION

a) <u>Termination After Closing by LICENSOR.</u> If the Agreement is terminated after Closing by LICENSOR for reasons permitted under Section 15, then (i) all of the provisions of Subsection (d) below shall apply, and (ii) all Guaranteed Payments owed by LICENSEE during the then-current Term (or Renewal Term, as applicable) shall become immediately due and payable to LICENSOR; and (iii) all sublicenses issued by LICENSEE shall immediately terminate or, at LICENSOR's option, be assigned to LICENSOR; provided that whether or not sublicenses are terminated as required under this provision, the economic benefits of such sublicenses in the form of royalties or any other payments due to SUBLICENSEE shall be assigned to and accrue to the LICENSOR.

b) <u>Termination After Closing by LICENSEE.</u> If the Agreement is terminated after Closing by LICENSEE for reasons permitted under Section 15, then (i) all of the provisions of Subsection (d) below shall apply, and (ii) any unpaid Guaranteed Payments owed by LICENSEE during the then-current Term (or Renewal Term, as applicable) shall not be due to LICENSOR and any guarantees may be released; and (iii) all sublicenses issued by LICENSEE shall immediately terminate; provided that whether or not sublicenses are terminated as required under this provision, the economic benefits of such sublicenses in the form of royalties or any other payments due to SUBLICENSEE shall be assigned to and accrue to the LICENSOR.

c) <u>Post-Termination Obligations.</u> If the Agreement is terminated before or after Closing by either Party for any reason: (i) LICENSEE shall immediately return to LICENSOR all documents and other material (including electronic records) received from LICENSOR (including any copies thereof, in any medium) relating to the transactions contemplated hereby, whether obtained before or after Closing; (ii) The Mutual Confidentiality Agreement shall remain in full force and effect for the period set forth therein, notwithstanding the termination of this Agreement; (iii) the provisions of Sections 14, 16(c), 23, and 24 shall survive indefinitely, including with regard to any interpretation of this Agreement or resolution of any disputes hereunder; and (iv) any payment obligation existing or due at the effective date of termination shall survive until paid in accordance with the terms of this Agreement.

## 17. OPTION TO PURCHASE THE LICENSOR

- 12 -

Initials: _____

a) Beginning on the date one (1) year after the Effective Date, LICENSEE shall have an option to acquire outright AI Sealing, its subsidiaries and ownership of the Technology at any time by paying to LICENSOR the sum of Five Hundred Million U.S. Dollars $500,000,000.00 (the "Option"). All Royalties, Additional Royalties, and Guaranteed Payments already made to LICENSOR as of the Transfer Date shall be credited to LICENSEE against the Option price.

b) LICENSEE may exercise the Option by giving thirty (30) days notice to LICENSOR of its intent to acquire AI Sealing, its subsidiaries and the Technology. The effective date of LICENSEE'S exercise of the Option is called the "Transfer Date."

c) During the thirty (30) day notice period, the parties will negotiate in good faith to mutually agree on the documentation required to transfer to LICENSEE all right, title and interest in AI Sealing, its subsidiaries and the Technology (including, if applicable, appropriate governmental and regulatory filings, confidentiality agreements, covenants not to compete, and any similar documents). In addition to any other requirements or provisions, the purchase documentation shall include a NonCompetition Agreement prohibiting LICENSOR, its officers, directors, partners, members, owners, investors and affiliates for a period of Five (5) years commencing on the Transfer Date, from directly or indirectly, engaging in any activity in competition with the LICENSEE, including but not limited to involvement, whether as an owner, director, officer, manager, employee, consultant, lender representative or agent, or in any other capacity, or otherwise in any business that is involved in whole or in part, in a "Competing Business", (i.e., any business that is the same or similar to a business that sells, manufactures, distributes or markets similar Technology and Improvements to Technology as provided for herein. LICENSOR acknowledges and agrees that the lengths of the Restrictions on Competition contained herein are fair and reasonable. The Parties have attempted to the limit the LICENSORS rights to compete only to the extent necessary to protect the reasonable competitive business interest of this Exclusive License Agreement. If the above restrictions or any part of these restrictions are held invalid, this section will be considered as imposing the maximum restrictions allowed under the applicable state law in place of the invalid restriction or part of the restriction.

d) On the Transfer Date, the parties will execute the agreed-upon transfer documentation, and LICENSEE will pay to LICENSOR the remaining amount of the Option price if any. LICENSEE shall continue to pay to LICENSOR (or LICENSOR's designated successor in interest) the Royalties described in Section 3(a).

## 18. IMPROVEMENTS

(a) During the term of this Agreement, LICENSOR will promptly advise LICENSEE of any technical improvements, enhancements or other inventions which it develops relating to the Technology or products that may directly compete with the Technology ("Improvements"). All such Improvements shall remain the property of LICENSOR, provided, however, that the Improvements will be deemed to be part of the Technology, and as such will be subject to all of the provisions of this Agreement, including the right of LICENSEE to use or commercialize such Improvements during the Term in accordance with the terms of the License and any Improvements sold shall be subject to Royalties as provided for in Section (3)(a). LICENSOR shall provide an "Amended Exhibit A" to LICENSEE within 14 days of any Improvement. LICENSOR shall provide

- 13 -

Initials: [signatures]

LICENSEE the first right of refusal to purchase, license, sell, use, manufacture, distribute, and market any new technology that is developed and controlled by LICENSOR or its subsidiaries, affiliates, representatives, employees and assignees that is not directly competing with Technology.

(b) During the Term of this Agreement, LICENSEE will promptly advise LICENSOR of any technical improvements, enhancements or other inventions which it (or any permitted sublicensee) develops relating to the Technology or products that may directly compete with the Technology ("LICENSEE Improvements"). LICENSEE Improvements sold during the Term of and in accordance with the terms of License shall be subject to Royalties as provided for in Section (3)(a). LICENSEE hereby grants to LICENSOR a worldwide, non-exclusive, perpetual, royalty-free license to use such LICENSEE Improvements to the extent necessary to allow LICENSOR to continue to develop, market, and sell products based on or incorporating the Technology without interference or involvement of the LICENSEE. LICENSOR'S rights to LICENSEE'S Improvements shall cease upon LICENSEE exercising its Option pursuant to Section 17.

## 19. AGENCY

Upon execution of this Agreement, LICENSOR will be able to continue to seek out new business sales from non-existing clientele subsequent to this Agreement. LICENSOR shall have the option to sell, manufacture and distribute to any new clientele in their ordinary course of business or may refer the new clientele to LICENSEE as an Agent of LICENSEE pursuant to the Agency Agreement provided in **Exhibit B**.

## 20. AUDIT RIGHTS

a) LICENSOR shall have the right upon fourteen (14) days' notice to audit and inspect, or cause to be audited and inspected, any records relating to sales of the LICENSEE for purposes of determining royalty payments only. The records shall be limited to purchase orders, sales reports and any sales reports from Sublicensees.

b) LICENSEE shall have the right within a reasonable period prior to purchasing LICENSOR pursuant to Section 17 herein and with reasonable notice to LICENSOR have the right to audit and inspect, or cause to be audited and inspected, any records relating to the LICENSOR. The records shall include but not limited to the following: purchase orders, sales reports invoices, client list, financial statement, Cost of Goods sold and purchased, relevant reports from third party suppliers, blenders, manufacturers, distributors and any other company associated with LICENSOR.

c) If any inspection or audit discloses a discrepancy (wrongfully discounting sales, underreporting or understating actual sales) by either Party, then either Party may be authorized to invoice and charge the violating Party for all understated amounts plus apply an interest charge from the date the understated amount would have been originally due until the date of payment at the rate of 1.0%. In addition, if a discrepancy discovered through audit is greater than five percent (5%) of the relevant total amount reported, then the Party responsible for such discrepancy shall bear the full cost of the audit.

d) If any inspection or audit discloses an overpayment of royalties by LICENSEE, then the amount of such overpayment shall be added as a credit to LICENSEE on LICENSEE'S next payment due to LICENSOR (i.e., deducted from the total royalty payment amount due).

Initials: _____

- 14 -

**21. FORCE MAJEURE**

The term "Force Majeure" shall be defined to include fires or other casualties, acts of God, severe weather conditions, strikes or labor disputes, terrorism, cyber-attacks, war or other violence, or any law, order, proclamation, regulation, ordinance, demand, or requirement of any governmental agency not within a Party's reasonable control. Neither party will be considered to be in breach of, or default under, this Agreement on account of any delay or failure to perform which results from a Force Majeure, and which that Party is unable to overcome through the exercise of commercially reasonable diligence. If any Force Majeure event occurs, the affected Party will (i) give prompt written notice to the other Party; (ii) use commercially reasonable efforts to minimize the impact of the event, and (iii) resume performance of its obligations under this Agreement as soon as reasonably practicable upon termination of the event.

**22. NOTICE AND PAYMENT**

    a) Any notice required or permitted by this Agreement shall be in writing and delivered the other party at its address as set forth below:

LICENSOR: *4706 Brookview Dr. Sugar Land TX 77479*

LICENSEE: *32611 Raphael Farm Hills MI 48336*

    b) Notice will be effective upon delivery by any of the following methods: (i) personally delivered to the recipient, (ii) mailed by certified or registered mail, postage prepaid and return receipt requested, (iii) sent via Federal Express or other internationally recognized courier service, or (iv) sent by facsimile or other electronic transmission, provided a duplicate copy is simultaneously sent via method (i), (ii) or (iii).

    c) Either party may change the address to which notice or payment is to be sent by written notice to the other in accordance with this section.

**23. DISPUTE RESOLUTION**

Any dispute between the Parties, or between LICENSEE and any sublicensee, shall immediately be brought to the other Party's attention by written notice, together with a proposal for resolving the dispute. The Parties shall discuss the proposal within five (5) business days, seeking in good faith to resolve it. If the dispute is not then resolved, either party may seek to have the dispute mediated for a third-party neutral; the mediation service shall take place in Harris County Texas and the timing and process would be subject to mutual agreement between the Parties. If the dispute is not promptly mediated or otherwise resolved, either Party may invoke binding arbitration proceedings to resolve such dispute; the arbitration service shall take place in Harris County Texas and the timing and process would be subject to mutual agreement between the Parties. The Parties agree that the foregoing is the preferred means for resolving any disputes that arise between them; however, each Party reserves it right to seek injunctive or other equitable or legal relief if it deems such necessary to enforce or protect its rights. Should any arbitration or other legal proceeding produce a prevailing party, the non-prevailing party shall pay all reasonable legal fees and expenses incurred by the prevailing party.

- 15 -

Initials: _____ _____

## 24. MISCELLANEOUS PROVISIONS

a) Nothing in this Agreement shall cause the parties to be construed as partners or joint venture partners, or as the employee of the other. Neither party will have any right or authority to create any obligations on behalf of, or in the name of, the other party, or to bind the other party to any contract, agreement or undertaking of any kind or nature whatsoever.

b) This Agreement is written in the English language, which shall be the binding and controlling language for all matters relating to its meaning and interpretation. All payments due shall be payable in U.S. Dollars. Titles and headings are for convenience of reference only, and shall not affect the meaning or interpretation of this Agreement.

c) The provisions of this Agreement will bind the Parties and their respective administrators, successors and assigns. Neither Party may assign this Agreement, in whole or in part, without the express prior written consent of the other Party, which shall not be unreasonably withheld; except that LICENSOR may assign this Agreement at any time after two (2) years after the Effective Date to a person or entity acquiring all or substantially all of the assets of the LICENSOR (whether by merger, acquisition, or asset sale) without the consent of LICENSEE, provided that (i) LICENSOR has first provided written notice to the LICENSEE including the terms and conditions of any proposed transfer; (ii) LICENSEE shall have a first right to acquire the assets of LICENSOR, either by matching the proposed offer in writing or by exercising its Option under Section 17, within ten (10) days of receiving such notice form LICENSOR; and (iii) further provided that the acquiring entity fully complies with all terms and conditions of this Agreement (including without limitation all representations and warranties and covenants); has the means and ability to perform all aspects of this Agreement; and fully accepts all of the rights and obligations of this Agreement.

d) No waiver by either party of any of its rights or remedies under this Agreement will be effective unless made in writing, and no such waiver shall be deemed as a waiver of any prior or subsequent rights or remedies, of either the same or other provisions under this Agreement.

e) If any term or provision of this Agreement is held invalid or unenforceable by a court of competent jurisdiction, such invalidity shall not affect the validity or operation of the remainder of the Agreement, and such invalid term or provision shall be deemed severed from the Agreement to the extent permitted by applicable law.

f) This Agreement constitutes the entire understanding of the Parties and supersedes all prior understandings and agreements between the Parties. This Agreement may not be modified or amended except by a written amendment, signed by each of the parties and specifically referring to this Agreement. This Agreement shall take precedence over any other documents which may conflict with it.

g) This Agreement may be executed in multiple counterparts, each of which will deemed an original and which together will constitute a single document. Copies of this Agreement delivered by facsimile or other electronic transmission will be effective as originals for all purposes.

h) In addition to the agreements and notices to be delivered as herein provided, each of the parties hereto shall, from time to time upon the reasonable request of the other party, execute and deliver such additional certificates, notices of instruments and shall take such

Initials: _____ _____

- 16 -

other action as may reasonably be required to more effectively carry out the terms of this Agreement.

i) Each party signing this Agreement warrants and represents that he/she has carefully read this Agreement, understands its terms and conditions, and executes the same of his/her own free will. Any corporation signing this Agreement represents and warrants that the execution, delivery and performance of this Agreement by such corporation has been duly authorized by all necessary corporate action and is valid and binding upon such corporation.

j) The parties acknowledge and agree that this Agreement has been the subject of substantial negotiations and therefore no party shall be construed or considered to be the drafter of this Agreement and that each of the Parties had the opportunity to seek counsel.

k) All Exhibits are expressly made a part of this Agreement.

l) The Parties represent to each other that each has reviewed or has had the opportunity to review each and every term of this Agreement with counsel, and that the Parties hereby acknowledge that they have carefully read this Agreement, they know and understand its contents, and they execute the Agreement freely and voluntarily.

m) The Parties acknowledge and agree that the restrictions contained in this Agreement are reasonable and necessary to protect the legitimate interests of each party and that they would not have entered into this Agreement in the absence of such restrictions and covenants. The Parties also acknowledge and agree that any money damages may be both incalculable and an insufficient remedy for any breach of this Agreement by the LICENSOR, and that any such breach would cause irreparable harm to LICENSEE. Accordingly, the Company acknowledges and agrees that in the event of any breach or threatened breach of this Agreement, LICENSEE, in addition to other remedies at law or in equity that it may have, shall be entitled to seek equitable relief, including injunctive relief and specific performance.

IN WITNESS WHEREOF, the undersigned duly authorized representatives of the parties have each executed this Agreement as of the Effective Date.

LICENSOR - AI Sealing, LLC                    LICENSEE - Knight Capital Partners Corp.

By: _____                 By: _____

Name: **Byron Yordanopoulos**                 Name: **Fadi Nona**

Title: _____              Title: president

- 17 -

Initials: _____