UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KNIGHT CAPITAL PARTNERS CORP.,

        Plaintiff,                                Case Number 16-12022

v.                                                                Honorable David M. Lawson

HENKEL AG & COMPANY, KGAA,

        Defendant.
_____/

## **OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS**

The question presented by the defendant's motion to dismiss is whether the conduct of Cedric Berthold, the defendant's European Senior Vice President and General Manager, was connected enough to this District to establish specific personal jurisdiction over the defendant for the plaintiff's claims of tortious interference with its business expectancy and a breach of a non-disclosure agreement. According to the facts pleaded in the complaint, it was. Plaintiff Knight Capital Partners Corporation (KCP) was brokering a three-way deal with the defendant's American subsidiary (Henkel Corporation [Henkel US]), and another company that held a patent on technology useful to Henkel US. KCP alleges that Berthold, acting on behalf of defendant Henkel AG & Company, KGaA (Henkel US's parent), torpedoed the deal so that Henkel US could deal directly with the technology holder, thereby cutting KCP out of the deal. Berthold did that, says KCP, by directing his communications to Henkel US in Michigan, so that the tortious conduct and its effects were intimately entwined in this District. Because the allegations in the complaint support that theory, the Court will deny Henkel AG & Company, KGaA's (Henkel Germany) motion to dismiss, which challenges personal jurisdiction.

I. Facts

The scuttled negotiations concerned a proposed three-way agreement between KCP, as a broker and technology license holder, AI Sealing, LLC (AIS), a Texas company and the holder of the patent rights for a "revolutionary" series of citrus-based compounds developed for cleaning dirty equipment at oil rigs and refineries (which had licensed its technology to KCP), and Henkel US, which under the contemplated partnership would have been responsible for marketing and distributing the products under the Henkel brand. KCP is located in Farmington Hills, Michigan. AIS has its facility in Harris County, Texas. Henkel US maintains a technical research and development center in Madison Heights, Michigan and a manufacturing plant in Warren, Michigan, both in the Eastern District of Michigan.

KCP alleges that Henkel US's German parent corporation, defendant Henkel Germany, undermined the negotiations between KCP and Henkel US, after Henkel Germany's principals who were involved in the negotiations concluded that Henkel US could secure a more lucrative deal by cutting out the middleman (KCP) and striking a deal directly with AIS instead. KCP contends that the end-run constituted tortious interference with its business expectancy and a breach of a non-disclosure agreement executed by KCP and Henkel US at the outset of the negotiations.

According to the complaint, defendant Henkel Germany used its influence over its U.S. affiliate, Henkel US, "to hijack hundreds of millions of dollars in potential profits from an extraordinarily lucrative business venture brought to [the] U.S. affiliate" by plaintiff KCP. KCP alleges that Henkel Germany tortiously interfered with its prospective deal with Henkel US, and breached a non-disclosure agreement that was executed by Henkel US and KCP. The non-disclosure agreement covered information disclosed during the negotiations, and prohibited the use of any

confidential information disclosed by KCP for any purpose beyond evaluating the viability of the proposed joint venture.

## A. Non-disclosure Agreement

In February 2014, KCP held a global license granted to it by AIS, covering a "unique cleaning technology" that was designed to be incorporated into cleaning products for use in oil and gas extraction and refinery maintenance operations. KCP approached Henkel US to explore the possibility of a deal for marketing and distribution of products based on the new technology. In an attempt to reach a deal, the parties engaged in lengthy negotiations, which persisted over several months. Beforehand, however, Henkel US and KCP entered into a non-disclosure agreement. That agreement governed the parties' handling of confidential information.

The non-disclosure agreement purportedly bound Henkel US *and* all of its affiliates, which are defined as follows:

> As used in this Agreement, "Affiliate" shall mean, with respect to a Party, any individual, corporation or other business entity which, either directly or indirectly, controls a Party, is controlled by a Party, or is under common control with a Party. As used herein, "control" means possession of the power to direct, or cause the direction of the management and policies of a corporation, or other entity, whether through the ownership of voting securities, by contract or otherwise.

NDA ¶ A.1. (Pg ID 50). The agreement defined "Receiving Party" as "Henkel [US] or its Affiliates receiving Confidential Information hereunder." NDA ¶ A.5. The Receiving Party was prohibited from "us[ing] the Confidential Information of the Disclosing Party except" for the purpose of investigating the feasibility of a future business relationship between the parties. The agreement was effective for a one-year term starting on April 23, 2014. It controlled all disclosures made during that term, with a "period of protection" extending for three years after the expiration or termination

of the agreement, during which the restrictions continued on use or disclosure of any confidential materials disclosed during the one-year term. The agreement allowed for early termination by either party at any time upon 30 days written notice to the other.

B. Negotiations

As the negotiations progressed, executives from Henkel US's German parent corporation, Henkel Germany, became involved. A main player was Cedric Berthold, Henkel Germany's Senior Vice President and General Manager in Europe.

KCP now believes that, as the negotiations proceeded, Berthold "developed a different agenda — i.e., to eliminate KCP from the business equation altogether and assume exclusive control over the Technology and the profits generated from its sales." Compl. ¶6. KCP asserts that "Henkel [Germany] and Henkel US are separate economic units and separate legal entities with independent business operations," Compl. ¶ 98-99, but it contends, nevertheless, that Berthold used his influence over the US affiliate to pursue his goal of sabotaging the deal by stalling and complicating the negotiations, and eventually by simply disregarding the NDA and inducing Henkel US to strike a deal directly with AIS.

On August 2, 2014, after some progress in the negotiations, Henkel US informed KCP that the proposed "Technology Distribution Deal" was approved for a pilot project in North America. Around that same time, another senior executive at Henkel Germany, Grant Kupko, became involved in the negotiations. From August through October 2014, KCP's principals consulted at least weekly meetings by phone with Kupko as they worked out details of the deal, identified departments and personnel within Henkel US that would be involved, and addressed "action items" identified by Henkel that needed to be addressed to ensure further progress. KCP and Henkel US also began

framing the details of pricing and marketing plans, including setting proposed price schedules and identifying potential customers.

On November 5, 2014, KCP executed a "Technology License Agreement" with AIS that granted to KCP a global exclusive license to use and commercialize the subject technology. However, that license was conditioned on KCP's success in closing the proposed distribution deal with Henkel US. The term of the AIS license was for five years, unless terminated according to its terms, but it would terminate if the deal between Henkel US and KCP did not close within 60 days, that is, by February 5, 2015.

On November 14, 2014, Henkel US presented the first draft of the proposed distribution agreement to KCP, and within days representatives from KCP, Henkel US, and Henkel Germany discussed and reviewed the draft agreement.

On November 21, 2014, KCP and Henkel US had a meeting in Bridgewater, Connecticut to discuss the deal and present it to senior executives of Henkel Germany, including Berthold, who attended the Connecticut meeting in person. Berthold told KCP's principals at the meeting that the deal was "attractive" to Henkel and fit with its strategy, and that Henkel agreed "to pursue the development of a formal agreement." Berthold also enumerated several issues with the agreement that needed to be addressed before the deal could move ahead.

Over the course of the several months following the late November meeting in Connecticut, the parties circulated more than 20 versions of the proposed distribution agreement. Revisions often were proposed, made, reviewed, and approved on the same day by representatives of KCP, Henkel US, and Henkel Germany. Representatives of all three entities had joint conference calls, sometimes daily, to discuss the deal.

On December 10, 2014, at Henkel US's request, KCP and AIS staged a product technology demonstration at a Henkel US product laboratory in Madison Heights, Michigan. Berthold personally attended the technology demonstration, and he was pleased with the results, stating that the demo was "very productive and informational." On December 17, 2014, the parties held a conference call to discuss details of the deal. Berthold participated in that call and "directed" the discussion from Henkel's side. On December 19, 2014, KCP's CEO, Fadi Nona, sent an email to Berthold outlining issues that KCP needed to address, and Nona and Berthold discussed those issues by phone later the same day. As a result of those discussions, Nona believed that the deal would be closed soon after the holidays.

In January 2015, Henkel Germany asked KCP, as a condition of finalizing the deal, to allow Henkel representatives to meet with a third-party company in Texas, known as Magnablend, that would be tasked with "blending" products under the arrangement, to ensure that Magnablend could handle the large volume of product that Henkel US believed it could sell to its customers. The meeting took place on January 28, 2015, and, after the meeting, Magnablend began the process of registering as a Henkel US supplier. Also in January, Berthold asked KCP to provide a customer list, including contact information, for customers that it planned to bring in as part of the deal, which KCP did. At the end of January, Berthold circulated to KCP and Henkel US "yet another version of the proposed distribution agreement, incorporating terms related to the expansion of the Project from just North America to Global."

In February 2015, Berthold asked that representatives of KCP travel to Germany for a meeting to finalize the agreement, and he represented that, of the work needed to conclude the deal, "only 5% is left." On February 18, 2015, Nona and Berthold conferred by phone about the

incorporation of new terms regarding global distribution, and, on February 20, 2015, Henkel US's counsel stated that he was awaiting final approval of the deal "from Germany." On March 3 and 4, 2015, representatives of KCP, Henkel US, and Henkel Germany met in Germany to finalize the deal. During the two-days of meeting, the parties discussed the terms of the expanded deal, and a "go to market" plan. But KCP was puzzled when the distribution agreement was not executed at the conclusion of the meetings. Nevertheless, after the meetings in Germany, Berthold urged KCP to begin contacting customers immediately, and Berthold even suggested marketing prospects in Europe and India.

In March 2015, at Berthold's request, KCP's Craig Bell attended a project implementation meeting in Mumbai, India as part of a global Henkel business unit meeting, to discuss the plan for implementing the distribution deal in different regions. However, despite the apparent imminent conclusion of the deal, Berthold then began to make "what seemed like endless requests of KCP involving such things as approving various modifications to the contract, marketing actions, customer contacts — all of which KCP provided — except one." The sticking point was Berthold's demand for "direct access" to KCP's technology partner AIS. KCP was concerned at that point that Berthold was trying to make an end run around the distribution deal and cut KCP out, in order to deal directly with AIS, so Nona responded that KCP would provide direct access only once the deal was concluded. The negotiations then took on a decidedly cooler tone, and KCP had very little contact with Henkel representatives for the rest of March and April. Some representatives of Henkel US told Nona they had been instructed to avoid contact with KCP, and Nona's requests to Henkel's US counsel for Henkel to renew the NDA, which was soon to expire, were ignored. Nona then

concluded that Berthold was simply running out the clock on the NDA so that Henkel could proceed with the deal without KCP.

On April 17, 2015. AIS terminated its licensing agreement with KCP, based on the failure to close the distribution deal. On April 20, 2015, KCP notified Henkel of the termination letter, but, to its surprise, "Henkel [Germany] agreed to move forward with the contract between Henkel US and KCP whether or not AIS was involved — indeed, Berthold directly expressed that he believed that AIS was only 'causing issues' and it was better that AIS was not involved." KCP then "began formulating 'Plan B' for the Project, which KCP presented to Henkel [Germany] on or around April 30, 2015." However, despite the ongoing negotiations and KCP's repeated requests, Henkel Germany still refused to extend the NDA.

On May 8, 2015, Berthold communicated to Nona that he was discussing the situation with other Henkel executives and that a "final go no go decision" would be made by the Henkel Germany Executive Committee by May 14, 2015. However, on May 22, 2015, Berthold told Nona that the Executive Committee was "interested," but needed further assurances that KCP reliably could deliver the product technology without AIS as a partner, and that a deal without AIS involved would not expose Henkel US to legal consequences. After the May 22, 2015 discussion, Nona heard nothing more from Berthold until June 5, 2015, when Berthold called Nona to tell him that Henkel US had been approached by AIS, and that although "no decision" had been made, the deal with KCP had been put "on hold" while Henkel US explored the prospect of dealing with AIS directly. KCP later learned, "[b]ased upon critical Henkel [Germany] internal documents that KCP has in its possession, . . . that after June 5, 2015[,] Henkel [Germany] fully pursued the Project without KCP and with AIS."

C. Procedural History

The plaintiff filed its complaint in this Court on June 3, 2016, asserting claims for tortious interference with a business expectancy and breach of the NDA by Henkel KGaA, which KCP contends were the consequences of Berthold's determination to sabotage the deal with Henkel US, and its eventual conclusion of a separate deal with AIS, after Henkel had leveraged KCP's eagerness during the negotiations to gain direct access to KCP's technology partner. The defendant initially filed a motion to quash the summons based on insufficient service of process, but that motion was withdrawn. It later filed this motion to dismiss for want of personal jurisdiction, and the Court heard oral argument on April 24, 2017.

II.

Citing Federal Rule of Civil Procedure 12(b)(2), defendant Henkel Germany argues that this Court cannot exercise personal jurisdiction over it. When personal jurisdiction is challenged in a motion filed under Rule 12(b)(2), the plaintiff bears the burden of establishing the Court's authority to proceed against the defendant. *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991) (citing *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); *Am. Greetings Corp. v. Cohn*, 839 F.2d 1164, 1168 (6th Cir. 1988); *Weller v. Cromwell Oil Co.*, 504 F.2d 927, 929 (6th Cir. 1974)). Henkel Germany offers no affidavits or other factual statements in support of its motion, but instead argues that the allegations in the complaint simply do not support personal jurisdiction over it in this District. The plaintiff, therefore, need only present a *prima facie* case for personal jurisdiction, and the Court views the submissions in the light most favorable to the plaintiff. *Id.* at 1458-59.

The parties agree on the basic law. In a case where subject matter jurisdiction is based on diversity of citizenship, as here, federal courts look to state law to determine personal jurisdiction. *See* Fed. R. Civ. P. 4(k)(1); *Miller v. AXA Winterthur Ins. Co.*, 694 F.3d 675, 678 (6th Cir. 2012). If a Michigan court would have jurisdiction over a defendant, so would a federal district court sitting in this state. *Daimler AG v. Bauman*, --- U.S. ---, 134 S. Ct. 746, 753 (2014) (explaining that "[f]ederal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons"). Michigan law recognizes two bases for personal jurisdiction over corporations: general, Mich. Comp. Laws § 600.711, and specific (called "limited personal jurisdiction" in state law parlance), Mich. Comp. Laws § 600.715.

The plaintiff does not rely on general personal jurisdiction over Henkel Germany. Michigan's so-called Long Arm Statute defines the scope of its limited personal jurisdiction. But "[t]he Due Process Clause of the Fourteenth Amendment constrains a State's authority to bind a nonresident defendant to a judgment of its courts." *Walden v. Fiore*, --- U.S. ---, 134 S. Ct. 1115, 1121 (2014). Michigan interprets its Long Arm Statute to allow personal jurisdiction to extend to the limits imposed by the federal constitution. *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 954 F.2d 1174, 1176 (6th Cir. 1992).

"'Specific' or 'case-linked' jurisdiction depends on an affiliation between the forum and the underlying controversy." *Walden*, 134 S. Ct. at 1122 n.6 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). To satisfy the Due Process Clause, the Court must find that "the defendant's suit-related conduct . . . create[s] a substantial connection with the forum State." *Id.* at 1121. "In other words, there must be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State

and is therefore subject to the State's regulation.'" *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 582 U.S. ---, No. 16-466, 2017 WL 2621322, at *6 (June 19, 2017) (quoting *Goodyear*, 564 U.S. at 919).

The defendant's physical presence within the jurisdiction is not a necessary condition for personal jurisdiction, but "the nonresident generally must have 'certain minimum contacts such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Walden*, 134 S. Ct. at 1121 (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)) (alterations omitted). The Sixth Circuit historically has applied three criteria to guide the minimum contacts analysis, which it enunciated in *Southern Machine Company, Inc. v. Mohasco Industries, Inc.*, 401 F.2d 374 (6th Cir. 1968):

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Southern Machine*, 401 F.3d at 381.

A.

The defendant argues that transitory contacts in the course of contract negotiations that ultimately never came to fruition are insufficient to show that the defendant "purposely availed" itself of the privilege of doing business in the state. That is particularly so, it says, where those contacts were directed into Michigan in response to a solicitation to engage in a business enterprise that was initiated by the plaintiff, which is located here.

"Purposeful availment is present where the defendant's contacts with the forum state proximately result from actions by the defendant himself that create a substantial connection with the forum state." *Means v. United States Conference of Catholic Bishops*, 836 F.3d 643, 649 (6th Cir. 2016) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985); *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 889 (6th Cir. 2002)). "The defendant's conduct and connection with the forum must be such that he should reasonably anticipate being haled into court there." *Ibid.* "'Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the random, fortuitous, or attenuated contacts he makes by interacting with other persons affiliated with the State.'" *Ibid.* (quoting *Walden*, 134 S. Ct. at 1123).

The plaintiff contends that the exercise of personal jurisdiction is warranted in this case based on (1) the execution of a non-disclosure agreement by Henkel US, which the plaintiff asserts also was binding on Henkel Germany and which allegedly was breached by the German parent company's actions when it made an "end run" around the plaintiff and entered into a deal directly with the plaintiff's technology partner instead; (2) the personal visit to Michigan by one of the defendant's senior executives for a product technology demonstration, during the months-long negotiations in anticipation of a product distribution deal; and (3) numerous email and telephone contacts between principals of the plaintiff and defendant concerning the details of that deal, which were directed by the defendant to the plaintiff in Michigan.

The facts surrounding the negotiation and execution of the non-disclosure agreement do not help the plaintiff's cause. Even if Henkel Germany can be considered a party to that agreement, the existence of that contract is not sufficient in itself to establish sufficient minimum contacts with this District. *Burger King*, 471 U.S. at 478 ("If the question is whether an individual's contract with an

out-of-state party alone can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot."). Likewise, mere negotiation of a contract that involved communications and in-person execution by the defendant within the forum state does not establish sufficient minimum contacts, where no ongoing relationship involving any substantial performance within the forum state was contemplated. *Capital Dredge & Dock Corp. v. Midwest Dredging Co.*, 573 F.2d 377, 380 (6th Cir. 1978). Nor would merely signing the contract in the forum suffice. *LAK, Inc. v. Deer Creek Enterprises*, 885 F.2d 1293, 1301-02 (6th Cir. 1989).

The plaintiff points to numerous instances of telephone and email communications directed to it by the defendant, along with Cedric Berthold's visit to Michigan for the technology demonstration, to show that Henkel Germany "did business" within the State. However, the plaintiff overlooks the well-established rule that it is not the quantity of contacts that matters but the quality. Here, the quality of the contacts — their topic, substance, and impact — indicate that they bear no substantial relationship to the forum state. They offer little support for a finding of sufficient minimum contacts. As the Supreme Court recently explained in *Walden v. Fiore*, --- U.S. ---, 134 S. Ct. 1115 (2014), the fact that the contacts were with a plaintiff that was itself an entity incorporated in and operating within the forum is immaterial, absent some indication that the contacts involved attempts by the defendant to establish its own ties to the state. The analysis must "look[] to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Id.* at 1122. Although the Court has sustained personal jurisdiction "over defendants who have purposefully 'reached out beyond' their State and into another by, for example, entering a contractual relationship that 'envisioned continuing and wide-reaching contacts' in the

forum State," "the plaintiff cannot be the only link between the defendant and the forum." *Id.* at 1122-23.

In this case, it is unclear what, if any, impact on the defendant's dealings in this state the distribution deal itself ultimately could have had. From the facts alleged, it evidently concerned products that would be developed and made in Texas and distributed on a national or global scale. Notwithstanding vague allusions to an intent by the parties to make Michigan "the seat of the project," the plaintiff has not pointed to any specific terms of the deal that would involve any performance to be undertaken in Michigan, or any specific efforts of the parties that would be devoted to exploiting the state as a potential market for the venture. The negotiations between the parties, and the defendant's participation in them with the plaintiff, were not directed specifically to this forum. Instead, they were the sort of "random, fortuitous, or attenuated" interactions that the Sixth Circuit and the Supreme Court have found insufficient to establish sufficient minimum contacts. *See Reynolds v. Int'l Amateur Athletic Fed'n*, 23 F.3d 1110, 1118 (6th Cir. 1994) (holding that, despite evidence of some communications and business dealings, none of the circumstances of the parties' interactions were enough to establish sufficient minimum contacts by the defendant). The parties' affairs had no underlying connection to the forum state itself, but only were directed into the forum because the plaintiff happened to be situated therein. *Id.* at 1118-19 (reiterating that "minimum contacts can only be formed by 'an action of the defendant purposefully directed toward the forum State'") (citation omitted); *see also International Technologies Consultants, Inc. v. Euroglas S.A.*, 107 F.3d 386, 395 (6th Cir. 1997) ("[Our] conclusion [is not] altered by the fact that the defendants communicated with International Technologies in Michigan by letter, telephone, and facsimile. Such communications have no talismanic qualities, and the only reason the

communications in question here were directed to Michigan was that International Technologies found it convenient to be present there.").

Moreover, the plaintiff does not assert anywhere in the complaint or its briefing that the defendant would have been a direct party to any iteration of the contemplated agreement. Worthy of note here is that the plaintiff explicitly has alleged that Henkel US and Henkel Germany are entirely separate entities, neither of which controls the other. The plaintiff has not alleged that Henkel Germany has any operations, facilities, or personnel located in Michigan, nor does it conduct any business itself within the state. Any connection between Michigan and any parties to the distribution deal, or any anticipated performance by them, so far as the facts alleged indicate, would have involved Henkel US, which is not a party to this case, not Henkel Germany, which is the defendant. And it is well established that mere corporate affiliation or beneficial ownership of a possibly involved entity by a distinct corporate entity defendant is insufficient to establish minimum contacts. *Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1273-74 (6th Cir. 1998) (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984); *Shaffer v. Heitner*, 433 U.S. 186, 216 (1977); *American Greetings Corp. v. Cohn*, 839 F.2d 1164, 1170 (6th Cir. 1988)).

However, the complaint does include facts that support an inference suggesting that Henkel Germany committed the alleged tortious act in Michigan when it directed its communications to its U.S. affiliate located here for the purpose of scuttling the three-way deal. KCP has alleged that the defendant's intentional conduct directed Henkel US to slow walk the negotiations with plaintiff and run out the clock on the term of the NDA, which ought to be viewed as a setup for the eventual tortious breach of the NDA and improper end run around the plaintiff to secure a direct deal with its technology partner. That scenario, amply supported by the facts alleged, fits neatly into the template

of *Calder v. Jones*, 465 U.S. 783 (1984). In that case, plaintiff Shirley Jones filed a lawsuit in a California state court alleging that she had been libeled in an article written and edited by the defendants in Florida. "The article was published in a national magazine with a large circulation in California." *Id.* at 784. The Court held that it was proper for the California court to exercise jurisdiction over the Florida residents because their intentional conduct allegedly was calculated to cause injuries to the plaintiff in California. The Court reasoned:

> The allegedly libelous story concerned the California activities of a California resident. It impugned the professionalism of an entertainer whose television career was centered in California. The article was drawn from California sources, and the brunt of the harm, in terms both of respondent's emotional distress and the injury to her professional reputation, was suffered in California. In sum, *California is the focal point both of the story and of the harm suffered*. Jurisdiction over petitioners is therefore proper in California based on the "effects" of their Florida conduct in California.

*Id.* at 788-89 (emphasis added).

The plaintiff here alleges that the defendant thwarted the potential deal with Henkel US by obstructing and delaying the negotiations between the plaintiff and Henkel US. The plaintiff alleged that Henkel US has both a technology center and a manufacturing facility located in this District, and that at least some of the negotiations with Henkel US were centered there. It is fair to infer from the pleadings that Henkel US has either its main project agents or significant operations in Michigan that were involved in the negotiations or would have been involved in Henkel's contemplated performance under the distribution deal. It also fair to infer that Henkel Germany and its operatives (including Cedric Berthold) had communications with or influence over decision makers within the U.S. affiliate's Michigan-based business units, and that *some of those communications* may have comprised tortious efforts by the German defendant to induce its U.S. affiliate to scuttle the deal.

KCP alleged that representatives of Henkel US told its CEO, Fadi Nona, that they had been instructed to avoid contact with KCP, during a critical phase of the negotiations.

If those inferences prove true (and borrowing liberally from *Calder*'s operative language), the allegedly tortious interference concerned the Michigan activities of a Michigan corporation. It obstructed the business dealings of an entity whose operations were centered in Michigan. The obstructive communications were directed to the plaintiff's potential partner in a Michigan-based joint venture, and the brunt of the harm, in terms of the lost opportunity, was suffered in Michigan. In sum, Michigan is "the focal point" both of the obstructive communications "and of the harm suffered." Jurisdiction over the defendant therefore is proper in Michigan based on the "effects" of the defendant's conduct initiated in Germany and directed at Michigan. *See Calder*, 465 U.S. at 791.

Notably, the Court in *Calder* expressly disclaimed reliance on a single alleged visit by one of the reporter defendants to California, and on various alleged investigative activities carried out within the state, instead focusing solely on its conclusion that the exercise of jurisdiction sufficiently was justified by the intentional writing by the defendants of the allegedly defamatory story for publication within the forum. *Calder*, 465 U.S. at 785 n.4, 787 n.6.

The *Calder* Court found that the defendants' tortious conduct alone, intentionally directed into the forum state, and producing harmful effects felt there, was enough to establish that the defendants had the required minimum contacts to make the exercise of jurisdiction proper. It therefore is clear, based on *Calder*, that there need not be any other or further contacts beyond a single instance of intentional tortious interference by the defendant with the plaintiff's affairs within the forum, as long as the unlawful conduct was sufficiently directed and related to the forum to itself qualify as the relevant contact. *Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014) ("*International*

*Shoe* recognized . . . that 'the commission of some single or occasional acts of the corporate agent in a state' may sometimes be enough to subject the corporation to jurisdiction in that State's tribunals with respect to suits relating to that in-state activity." (quoting 326 U.S. at 318)).

The plaintiff has pleaded facts establishing purposeful availment.

B.

The Sixth Circuit has "'articulated the standard for [the 'arising from'] prong in a number of different ways, such as whether the causes of action were made possible by or lie in the wake of the defendant's contacts, or whether the causes of action are related to or connected with the defendant's contacts with the forum state.'" *AlixPartners, LLP v. Brewington*, 836 F.3d 543, 552 (6th Cir. 2016) (quoting *Air Products & Controls, Inc. v. Safetech International, Inc.*, 503 F.3d 544, 553 (6th Cir. 2007)). "It is clear, however, that this is a lenient standard and the cause of action need not formally arise from defendant's contacts." *Ibid.* (quotations omitted). This element of the test is easily satisfied.

KCP maintains that agents of Henkel Germany instructed its U.S. affiliate to curtail contacts during end-game stage of the negotiation. That would have caused the NDA to expire, along with KCP's licensing agreement with AIS. The defendant's instructions to its affiliate in Michigan would have been a key component to the illegal interference alleged by KCP. "At a minimum, this factor is satisfied if the cause of action, of whatever type, has a substantial connection with the defendant's in-state activities." *Ibid.* (citing *Bird v. Parsons*, 289 F.3d 865, 875 (6th Cir. 2002); *Third National Bank in Nashville v. WEDGE Group Inc.*, 882 F.2d 1087, 1091 (6th Cir. 1989)). The allegations satisfy the requirement that "[t]he defendant's contacts with the forum state must relate to the

operative facts and nature of the controversy." *Community Trust Bancorp, Inc. v. Community Trust Financial Corp.*, 692 F.3d 469, 472-73 (6th Cir. 2012).

C.

"The final requirement is 'whether exercising personal jurisdiction over [the defendant] would be reasonable, i.e., whether it would comport with traditional notions of fair play and substantial justice.'" *AlixPartners*, 836 F.3d at 552 (quoting *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1267-68 (6th Cir. 1996)).

The Court has found that the conduct of Henkel Germany's agents amounts to purposeful availment, and the alleged tortious conduct arose from the defendant's contacts with this forum. Where "'the first two criteria are met . . . only the unusual case will not meet this third criterion.'" *Ibid.* (quoting *Theunissen*, 935 F.2d at 1461).

"In analyzing this requirement, [the Court must] consider a number of factors, including: '(1) the burden on the defendant; (2) the interest of the forum state; (3) the plaintiff's interest in obtaining relief; and (4) other states' interest in securing the most efficient resolution of the policy.'" *Ibid.* (quoting *Air Products*, 503 F.3d at 554-55)). "'Because there is an inference of reasonableness when the first two *Southern Machine* prongs are satisfied, [where] there are no considerations put forward by [the defendant] to overcome or contradict that inference, the exercise of jurisdiction is reasonable under the circumstances.'" *Id.* at 552-53 (quoting *Air Products*, 503 F.3d at 555).

The defendant is a German company. But it has an affiliate with a substantial presence in Michigan. And it participated along with its affiliate in the contract negotiations. It is likely that many of the relevant witnesses are located here, although many, no doubt, will be found in other jurisdictions. Nonetheless, it is plain that this state has an interest in vindicating its corporate

citizens who allege that foreign entities have reached into this jurisdiction to commit torts that result in loss and damage. The third element of the *Southern Machine* test is satisfied.

III.

The plaintiff has pleaded sufficient facts in its complaint to establish a *prima facie* case for personal jurisdiction over the defendant.

Accordingly, it is **ORDERED** that the defendant's motion to dismiss for want of personal jurisdiction [dkt. #24] is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: June 23, 2017

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on June 23, 2017.

s/Deborah Tofil
DEBORAH TOFIL