UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KNIGHT CAPITAL PARTNERS CORP.,

               Plaintiff,                               Case Number 16-12022

v.                                             Honorable David M. Lawson

HENKEL AG & COMPANY, KGaA,

               Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMARY JUDGMENT, DENYING PLAINTIFF'S MOTION TO AMEND THE COMPLAINT DISMISSING MISCELLANEOUS MOTIONS, AND DISMISSING COMPLAINT

Plaintiff Knight Capital Partners Corporation (KCP) filed a complaint alleging that the defendant unlawfully interfered with KCP's business opportunity to market a product based on technology exclusively controlled by KCP's contracting partner. The plaintiff alleged that it entered into a nondisclosure agreement with the defendant's separate U.S. subsidiary, with which it was negotiating a long-term marketing deal, but the defendant violated that agreement and upset the negotiations so that it could contract directly with the technology licensee and cut the plaintiff out of the relationship. According to the complaint, it was Cedric Berthod, the defendant's European Senior Vice President and General Manager, who orchestrated the illegal scheme. Based on those allegations, the Court denied the defendant's motion to dismiss, finding that the plaintiff pleaded a viable claim that could be prosecuted in a federal court located in Michigan. *Knight Capital Partners Corp. v. Henkel AG & Co., KGaA*, 257 F. Supp. 3d 853 (E.D. Mich. 2017).

Now before the Court are the defendant's motion for summary judgment and the plaintiff's motion to amend its complaint to add an unfair trade practices claim under Connecticut law. The

factual record developed by the discovery paints an entirely different picture than the story told by the pleadings. As it turns out, KCP's contracting partner, AI Sealing, LLC (AIS), did not have the exclusive rights to the technology. The defendant was not a party to the nondisclosure agreement and did not breach it. And the defendant is the beneficial 100 percent owner of its U.S. subsidiary, Henkel Corporation (Henkel US), and cannot be held liable on a "tortious interference" theory for "interfering" with a prospective deal involving its wholly owned subsidiary. The defendant is entitled to a judgment as a matter of law, because KCP has failed to establish genuine fact issues on all the elements of its claims. Likewise, none of the facts proffered by the plaintiff are sufficient to establish a substantial connection between the dealings of the parties during their negotiations and the State of Connecticut, which is a fundamental premise for any viable claim under that state's Unfair Trade Practices Act. The Court will deny the motion to amend the complaint, grant the motion for summary judgment, and dismiss the case, along with other pending motions.

### I. Factual Background
#### A. The Negotiations

Based on the motion briefs, it appears that most of the background facts about the negotiations between the parties for a contemplated technology licensing and distribution deal are undisputed.

In February 2014, plaintiff KCP held a global license granted to it by AIS, a Texas company that purported to hold the exclusive patent rights for a "revolutionary" series of citrus-based compounds developed for cleaning dirty equipment at oil rigs and refineries. KCP approached non-party Henkel US, the defendant's subsidiary, to explore the possibility of a deal for marketing and distribution of products based on the new technology. In an attempt to reach a deal, the parties

engaged in lengthy negotiations, which persisted over several months. Beforehand, however, Henkel US and KCP entered into a nondisclosure agreement.

## B. The Nondisclosure Agreement

The nondisclosure agreement signed by KCP and Henkel US identified the parties to the agreement as follows:

> This Unilateral Confidentiality Agreement ("Agreement") . . . is between Henkel Corporation ("Henkel") . . . and Knight Capital Partners Corp. ("Company"). . . . Henkel and Company shall be individually referred to as a "Party" and collectively referred to as the "Parties."

(ECF No. 25-11 PageID.5596). The agreement was executed in April 2014 by representatives of Henkel US and KCP. It defined "Confidential Information" within its scope as "any non-public and confidential or proprietary information of [KCP] or its Affiliates disclosed in any form or format to Henkel or its Affiliates under this Agreement." The term "Affiliates" was defined to include, "with respect to a Party, any individual, corporation or other business entity which, either directly or indirectly, controls a Party, is controlled by a Party, or is under common control with a Party . . . whether through the ownership of voting securities, by contract or otherwise." The agreement further stated that "the 'Receiving Party' shall refer to Henkel or its Affiliates receiving Confidential Information hereunder." With respect to "Restrictions on Use," the agreement stated that the "Receiving Party shall not use the Confidential Information of the Disclosing Party except for the Purpose," which was "to investigate the feasibility of a future business relationship between the Parties."

The agreement was effective for one year starting on April 23, 2014, and it controlled all disclosures made during that time, with a "period of protection" extending for three years after the

expiration or termination of the agreement, during which the restrictions continued for use or disclosure of any confidential materials disclosed during the one-year term. The agreement also included a choice of law provision stating that it would be construed according to the laws of the State of Connecticut, and the parties agree that Connecticut state law governs any breach of contract claim.

## C. Termination of Negotiations

The scuttled negotiations concerned a proposed three-way agreement between KCP, as a broker and technology license holder, AIS as the inventor of the technology, and Henkel US, which under the contemplated partnership would have been responsible for marketing and distributing the products under the Henkel brand.

The parties engaged in extensive negotiations involving principals of KCP, Henkel US, and Henkel Germany from August 2014 through early 2015. On November 14, 2014, Henkel US presented the first draft of a proposed distribution agreement to KCP, and within days representatives from KCP, Henkel US, and Henkel Germany discussed and reviewed the draft agreement. On November 21, 2014, KCP and Henkel US representatives met in Bridgewater, New Jersey to discuss the deal and present it to senior executives of Henkel Germany, including Cedric Berthod, who attended the New Jersey meeting in person. Berthod told KCP's principals at the meeting that the deal was "attractive" to the Henkel companies and fit with its strategy. Henkel US agreed "to pursue the development of a formal agreement." Berthod also identified several issues with the agreement that needed to be addressed before the deal could move ahead.

The negotiations continued and increased in intensity until, in late March 2015, KCP's principal, Fadi Nona, and Berthod reached an impasse over Berthod's demand for "direct access"

to KCP's technology partner, AIS. Nona refused and told Berthod that access to AIS would be provided only after the distribution deal was consummated. The negotiations then abruptly cooled, KCP had little contact with Henkel's principals over the following weeks, and Henkel US did not respond to KCP's requests to renew the nondisclosure agreement. On April 17, 2015. AIS terminated its licensing agreement with KCP, based on the failure to close the distribution deal within the prescribed time. KCP attempted to revive the negotiations, but on June 5, 2015 Berthod called Nona to tell him that Henkel US had been approached by AIS, and that although "no decision" had been made, the deal with KCP had been put "on hold" while Henkel US explored the prospect of dealing with AIS directly.

Henkel asserts — and the plaintiff now admits (and actually alleges in its proposed amended complaint) — that neither Henkel company ever reached a deal with AIS. Henkel contends that the reason was because it ultimately was "unable to verify the commercial feasibility of the technology." Moreover, Henkel US also asserts, and the plaintiff admits, that Henkel US never proceeded to develop or market any similar or competing product on its own.

It now is undisputed — contrary to the plaintiff's explicit allegations in the original complaint — that after the negotiations broke down, Henkel Germany ultimately decided not to proceed with developing or marketing any refinery cleaning product with AIS or any other external partner. It also scrubbed any plans it may have had to develop any similar product on its own.

D. Procedural History

The plaintiff filed its complaint against Henkel Germany in this Court on June 3, 2016, asserting claims for tortious interference with a business expectancy (Count I) and breach of the nondisclosure agreement (Count II). On June 23, 2017, the Court denied the defendant's motion

to dismiss for want of personal jurisdiction, *Knight Capital Partners*, 257 F. Supp. 3d at 867, and on November 30, 2017, the Court granted the plaintiff's motion to compel and ordered the defendant to turn over comprehensive discovery that it claimed it was barred from disclosing under European data privacy laws, *Knight Capital Partners Corp. v. Henkel Ag & Co., KGaA*, 290 F. Supp. 3d 681 (E.D. Mich. 2017). The discovery and motion filing deadlines later were twice extended at the joint request of the parties. Discovery closed on May 1, 2018.

The plaintiff filed a motion for leave to file an amended complaint on April 30, 2018, but it was not accompanied by a brief, presumably due to the inclusion of exhibits that had been marked "confidential" by the defendant during discovery. The parties apparently agreed that those materials did not need to be filed under seal, and the plaintiff filed a brief in support of its motion to amend on May 2, 2018.

## II. Defendant's Summary Judgment Motion

Henkel Germany argues in its motion for summary judgment that (1) as a matter of law, it cannot be held liable for breach of a contract to which it was not a party; (2) the tortious interference claim cannot be sustained because the prospective distribution deal was subject to a number of contingencies that never were satisfied by the plaintiff, including that (a) it never held, as it claimed, an exclusive license over the technology in question, and (b) the entire deal with Henkel US was explicitly premised on approval by senior executives at its parent company, Henkel Germany, which never was given; and (3) in any event, a parent company cannot, as a matter of law, be held to "tortiously interfere" with the affairs of its own wholly owned subsidiary entity, even if that interference extends to directing the subsidiary to breach a contract that it has made with a third party. The defendant made a point of asserting that it did not seek summary judgment

-6-

on the ground that it never breached the confidentiality agreement, but the Court ordered the parties to file supplemental briefs addressing that point. KCP filed a response contesting each of the defendant's arguments.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing the motion record, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

"The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." *Id.* at 558. (citing *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)). "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Ibid.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

"[T]he party opposing the summary judgment motion must do more than simply show that there is some 'metaphysical doubt as to the material facts.'" *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation marks omitted). The opposing party must

designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The submitted materials need not themselves be in a form that is admissible in evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "However, the party opposing summary judgment must show that [it] *can* make good on the promise of the pleadings by laying out enough evidence that *will be* admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary." *Alexander*, 576 F.3d at 558.

## A. Breach of Contract Claim

As noted above, the parties agree that Connecticut law governs the breach of contract claim, based on the nondisclosure agreement's choice-of-law provision. And as this case is here under the Court's diversity jurisdiction, the Court must "apply the same law that [the] state courts would apply." *Auburn Sales, Inc. v. Cypros Trading & Shipping, Inc.*, 898 F.3d 710, 715 (6th Cir. 2018) (citing *Kurczi v. Eli Lilly & Co.*, 113 F.3d 1426, 1429 (6th Cir. 1997)); *see also Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). That law usually comes from the state's highest court. *Auburn Sales, Inc.*, 898 F.3d at 715. "And where [the state's intermediate] appellate courts have spoken in the Supreme Court's absence, we will normally treat those decisions as authoritative absent a strong showing that the [state's Supreme Court] would decide the issue differently." *Ibid.* (quotations omitted). "In this latter scenario, we must also look to other available data, such as Restatements, treatises, law reviews, jury instructions, and any majority rule among other states." *Ibid.*

Under Connecticut law, there are at least two reasons why the breach of contract claim cannot succeed. *First*, it is well established that a plaintiff cannot recover on a breach of contract

claim from an entity that was not a party to the contract (Henkel Germany), and the plaintiff has not sued the only entity that was a counter-party to the contract (Henkel US). *Second*, it is apparent from the record outlined by the parties that there is no evidence of any conduct by either Henkel entity that breached the agreement, based on the plaintiff's present theory of the case.

1.

The Connecticut courts have recognized the "general principle so fundamental that it rarely receives mention in case law or commentary . . . that only parties to contracts are liable for their breach." *FCM Grp., Inc. v. Miller*, 17 A.3d 40, 54 (Conn. 2011). The "axiom[]" follows that "an action 'for breach of contract may not be maintained against a person who is not a party to the contract.'" *Szynkowicz v. Bonauito-O'Hara*, 154 A.3d 61, 69 (Conn. App. 2017) (quoting *FCM Group*, 17 A.3d at 54). The nondisclosure agreement here explicitly defines "*the* Parties" to the agreement as KCP and Henkel US. Henkel Germany is nowhere mentioned by name in the agreement, and the contract was not executed by any principals of that entity. The language of the agreement defining the parties is plain and unambiguous, and it contains an integration clause, which confirms that the document contains the parties' entire agreement and that its terms govern over any other oral or written understanding between the parties.

Connecticut courts construe plainly worded contracts such as this quite strictly, recognizing the primacy of the parties' intent, which "is to be ascertained by a fair and reasonable construction of the written words [bearing in mind that] the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." *Lynwood Place, LLC v. Sandy Hook Hydro, LLC*, 92 A.3d 996, 1001 (Conn. App.

2014). Where there is no ambiguity, "the determination of what the parties intended by their contractual commitments is a question of law." *Ibid.*

Any attempt to discern ambiguity from the writing must emanate from the language of the contract itself, not from any extrinsic subjective understanding of it. "Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms"; the "court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity." *Lynwood Place*, 92 A.3d at 1000-01. In this case, there is no ambiguity as to who are the parties to the nondisclosure agreement, and Henkel Germany is not among them.

On similar facts, the Connecticut courts repeatedly have held that an action for breach against a non-party cannot be maintained. *Szynkowicz*, 154 A.3d at 69 ("The only parties named in the dual agency agreement were the plaintiff, the plaintiff's tenant, the seller and Hanley, all of whom are the only parties to have signed the dual agency agreement. The dual agency agreement did not purport to bind the defendant nor did it refer to the defendant, who was neither a signatory to the dual agency agreement nor a title holder to the property."); *Bruno v. Whipple*, 54 A.3d 184, 193 (Conn. App 2012) ("There is no language in the contract identifying Whipple as a party thereto. On the basis of the written contract, the undisputed terms of which were properly before it, the court thus had a substantial basis for concluding that there was no genuine issue of material fact that Whipple was not a party to that contract and thus that he could not be held liable for its breach."); *FCM Group*, 17 A.3d 40, 55-56 ("[T]he contract refers throughout to the '[o]wner,' who is expressly identified therein as Jeffrey Miller. Furthermore, nothing in the contract purports to bind Cheryl Miller, who is neither a signatory to the contract nor a title holder to the property. Indeed, the contract contains no reference to Cheryl Miller. Because the plaintiff and Mercede

have offered no legal support for the attorney trial referee's finding that Cheryl Miller is liable for breaching the contract between Jeffrey Miller and the plaintiff, that portion of the trial court's judgment that was rendered against her cannot stand."); *Malich v. Sivilla*, 56 Conn. L. Rptr. 331, 2013 WL 3625476, at *5 (Super. Ct. June 24, 2013) ("[T]he evidence submitted shows that Eleanor Sivilla has neither signed a contract with the plaintiff nor expressed assent to be bound by any agreement with the defendant. The fact that she watched and inspected the plaintiff's work done under contract for Mathew Sivilla does not imply that she assented to being bound by any agreement to pay the plaintiff for that work.").

The plaintiff points to testimony from Zubin Rivetna, Henkel US's Technology Manager who executed the agreement, and Grant Kupko, one of Henkel Germany's principals, who attested that their understanding was that Henkel Germany was "bound by" the agreement. But the subjective belief of a party that a non-party is bound is insufficient to hold the non-party accountable on a claim for breach, where the agreement is plain and explicit in defining who was a party to it. *Szynkowicz*, 154 A.3d at 69 ("[T]he plaintiff's subjective belief that the defendant was a party to the alleged dual agency agreement does not alter the clear terms naming Hanley, alone, as the single agent to represent both the seller and the plaintiff." (citation and quotation marks omitted)). Participation by a non-party in the negotiation or performance of the agreement, even where it assumed a controlling role, also is not sufficient to make it a party liable to suit. *Id.* at 70 & n.6.

The plaintiff asserts that there is some lingering ambiguity in the contract language that defines "Receiving Party" to include Henkel US and its "Affiliates." An "Affiliate" is defined to include any separate entity holding a controlling interest in Henkel US. And the agreement

imposes "obligations" on the "Receiving Party," which include not disclosing or misusing the confidential information of the "Producing Party," defined to include KCP or any of its affiliates. However, read reasonably, in the context of the agreement as a whole, that language suggests only that Henkel US — as a "Party" to the agreement — could be held liable if any of its affiliates disclosed information. The record facts plainly show that Henkel Germany was an "affiliate" under the agreement, and therefore "bound" not to misuse the confidential information. But that does not make it answerable in damages to KCP, because nothing in the nondisclosure agreement's plain language suggests that the parties intended to make an "affiliate" a "party" to the agreement amenable to direct suit. Those shoes were filled by Henkel US, and by it alone, as the agreement plainly states.

Finally, the plaintiff contends, based on the testimony of Rivetna and Kupko, that Henkel Germany "consented" or "assented" to be bound by the agreement. And in its supplemental filings, it argues that the law favors a finding of liability against a party that consents to be bound by an agreement. The law that the plaintiff cites for this proposition, however, comes from Delaware authority, which is not controlling here. And adding a party to the nondisclosure agreement absent a writing would collide with the agreement's integration clause. Moreover, regardless of any subjective understanding held by principals of either entity, the plaintiff has not pointed to anything in the record to suggest that Henkel Germany ever *expressed* any such consent or assent to be "bound" to the plaintiff as a party to the agreement. To the contrary, its conduct as alleged, and its position throughout this litigation, suggests that it has never consented to be sued for breach of the agreement, regardless of whether for the sake of advancing the negotiations it conducted itself

more or less in conformance with the restrictions of the nondisclosure agreement, which was binding on Henkel US.

Henkel Germany cannot be sued for breaching the nondisclosure agreement because it was not a party to it.

2.

Perhaps more to the point, however, there is no evidence in the record that either Henkel company breached the nondisclosure agreement. The Court ordered supplemental briefs on this issue. The defendant does not advance this inquiry in its supplemental brief, since it chose to address an issue (i.e., whether the plaintiff suffered damages from the defendant's conduct) different than the one on which the Court requested supplemental. The plaintiff's supplemental brief makes clear, however, that it believes that Henkel Germany used confidential information in a way that exceeded the agreement's allowable "purpose," which was "to investigate the feasibility of a future business relationship between the parties." But KCP advocates an exceedingly narrow construction of that purpose, which the plain contract language does not support.

As noted earlier, when defending against the earlier motion to dismiss, KCP pointed to allegations in the complaint setting out as a crucial premise of the breach claim that Henkel Germany had delayed the negotiations in order to orchestrate an "end run" around KCP and deal directly with its technology holder, AIS. But that premise now seems to have evaporated in the light of discovery, which has revealed that Henkel never wound up making any deal at all, with anyone, relating to production or marketing of refinery cleaning products. It now is undisputed — contrary to the plaintiff's explicit allegations in the original complaint — that after the negotiations broke down, Henkel ultimately decided not to proceed with developing or marketing any refinery

cleaning product with AIS or any other external partner, and it also scrubbed any plans it may have had to develop any similar product on its own. This new narrative shows up in KCP's proposed amended complaint.

As its motion to amend makes clear, KCP's new theory of the case is that Henkel Germany breached the confidentiality agreement by "misusing" information about KCP's technology to decide not to make a deal with KCP *or* AIS, and also to decide that it did not want to pursue any similar technology on its own. It is difficult to discern how putting the information to that use departs from the allowable purpose of "investigat[ing] the feasibility" of forming a joint venture with KCP. Nothing in the nondisclosure agreement suggests that the question of feasibility was limited to technical issues. A fair reading of the agreement would permit using the information to assess economic feasibility, which would include evaluating the profitability of developing a similar product in house or with other partners. If the Henkel companies actually had gone to market with someone else using the information KCP revealed to it — or, arguably, even if they moved forward on their own — the plaintiff might have a legitimate gripe. But KCP now admits that Henkel did *nothing* with the information that it gained (except evaluate the "feasibility" of its options), which cannot plausibly support any claim that it wrongfully "used" confidential information to any discernible end.

The allegations in the proposed amended complaint do not improve KCP's claim. The plaintiff admits that Henkel ultimately decided not to pursue the project at all, with any partner, or on its own, because (1) it needed an external partner to locate customers; (2) redevelopment of a similar product from scratch would be impractical; and (3) Henkel would need to retain another external partner, Magnablend, to facilitate production, but Magnablend had been "locked up" by

KCP.   Citing internal Henkel documents, the plaintiff acknowledges that Henkel KGaA noted the "legal recommendation that organic Henkel product development could take place IF all development work was based on internal information and knowledge with no use of information gained through NDA."  The update also indicated that Henkel's internal development process "was put on hold to avoid any potential risk related to NDA violation."

Nothing in that recitation suggests that Henkel did anything other than what was explicitly contemplated by the nondisclosure agreement, which was to "use" the information gained to evaluate the viability of a joint venture between the parties.  Henkel's ultimate decision not to proceed with the refinery cleaning solution project in any form certainly cannot constitute a breach of the nondisclosure agreement, because that agreement did not require the parties to *do* anything; it merely restricted the use of the information that might be exchanged while they were deciding whether to do something.  The only information that the plaintiff contends was misused relates to the formulation of the product and the identity of its technology holder, AIS.  But there is no evidence that Henkel "used" knowledge of AIS's identity for any discernible purpose, since it is undisputed now that Henkel never wound up making any deal with AIS.  And the claim that Henkel "used" the information about the product to evaluate whether it could develop a similar product on its own — ultimately concluding that it could not — similarly does not demonstrate any "use" to an improper end.  Moreover, in a section headed "Independent Development," the agreement explicitly contemplates that Henkel could proceed with its own independent development efforts of similar products.  Agreement § C.1 (ECF No. 25-11, PageID.5598) ("[KCP] understands that [Henkel US and its affiliates] may currently or in the future be developing information internally, or receiving information from other parties that may be similar to [KCP's] Confidential

Information. Nothing in this Agreement will prohibit [Henkel] from developing products, or having products developed for it, that compete with [KCP's] products, provided that in doing so, [Henkel] does not use or disclose [KCP's] Confidential Information in breach of this Agreement."). Henkel certainly cannot be held liable for a "breach" of the agreement based on actions that the parties explicitly contemplated and allowed it to take.

Finally, the plaintiff's speculative allegation in the proposed amended complaint that it is "more likely than not" that Henkel US inevitably would have entered into a deal with KCP to license AIS's product formula is negated by a singular admission of the plaintiff, stated in both its original and amended pleadings, that throughout the period of the negotiations AIS did not even hold the rights to the product formula, and thus had no rights to license it to KCP. That fact alone suggests that it is extremely *unlikely* that the parties would have consummated a licensing deal, since the plaintiff admits that it had nothing to license. KCP did not identify the rightful technology holder or obtain a valid license to the product formula until November 2015, long after the negotiations between the parties fell apart between April and June of that year.

The basic facts are not in dispute. The plaintiff has not offered evidence of a breach of the nondisclosure agreement under any of its theories of liability.

## B.

The parties agree that the claim for tortious interference is governed by Michigan law, which settles the choice-of-law question on that count. *See State Farm Mut. Auto. Ins. Co. v. Norcold, Inc.*, 849 F.3d 328, 331 (6th Cir. 2017). To prevail, the plaintiff must offer evidence of "(1) a valid business relationship or expectancy; (2) knowledge of that relationship or expectancy on the part of the defendant; (3) an intentional interference by the defendant inducing or causing a

breach or termination of that relationship; and (4) resulting damage to the plaintiff.'" *Auburn Sales*, 898 F.3d at 715 (quoting *Warrior Sports, Inc. v. Nat'l Collegiate Athletic Ass'n*, 623 F.3d 281, 286 (6th Cir. 2010)). "'[T]he interference with a business relationship must be improper in addition to being intentional.'" *Ibid.* (quoting *Volunteer Energy Servs., Inc. v. Option Energy, LLC*, 579 F. App'x 319, 326 (6th Cir. 2014)).

The claim for tortious interference with a business expectancy cannot succeed as a matter of law for at least two reasons. *First*, a parent corporation cannot be held liable in tort for "interfering" with a contract involving its wholly owned subsidiary. *Second*, the plaintiff cannot demonstrate that it had any "valid business expectancy" in the product distribution deal, since it admits that it did not hold a valid right to license the technology that was the entire subject of the proposed joint venture, and in any event the conclusion of the deal explicitly was premised on discretionary approval of its terms by Henkel Germany, which never was secured during the negotiations.

1.

It is well settled under Michigan law that a parent cannot tortiously interfere with the affairs of its wholly owned subsidiary. *Speroni SpA v. Perceptron, Inc.*, 12 F. App'x 355, 360 n.4 (6th Cir. 2001); *Indusource, Inc. v. Sandvik Tooling France SAS*, No. 16-10056, 2016 WL 6216003, at *7 (E.D. Mich. Oct. 25, 2016) (citing *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.*, 475 F.3d 783, 800 (6th Cir. 2007)); *Inland Waters Pollution Control, Inc. v. Jigawon, Inc.*, No. 05-74785, 2008 WL 205209, at *12 (E.D. Mich. Jan. 22, 2008) (citing *Boulevard Associates v. Sovereign Hotels, Inc.*, 72 F.3d 1029, 1036 (2d Cir. 1995) (collecting cases)).

The plaintiff attempts to avoid this well settled principle by manufacturing a "question of fact" about whether Henkel US is wholly owned by Henkel Germany, pointing to a single exhibit from a presentation in which it is shown that Henkel Germany owns approximately 70% of an intermediate entity that in turn wholly owns Henkel US. But that contention simply ignores the second page of the same exhibit, which reveals that the "remainder" 30% interest in the intermediary is held through a circular web of subsidiary interests, via Henkel US, by which the entire ownership interest in the American company ultimately runs back to the prime global parent entity. *See* ECF No. 139-11 (PageID.6736-37). The plaintiff therefore has not offered any substantive rebuttal to the testimony of the defendant's legal officer who submitted a declaration attesting that "Henkel KGaA [is] the ultimate owner of Henkel Corp.," because "Henkel KGaA own[s] the entity that wholly own[s] Henkel Corp., Henkel of America, Inc. ("HOA")." That fact also is borne out by statements in the published annual report of the Henkel corporate entities. *See* ECF No. 143-3, Hanno Brenningmeyer decl. ¶¶ 7-8 (PageID.7180-82).

The plaintiff also points out that the Sixth Circuit in *Speroni* recognized that most jurisdictions have endorsed "an exception to the general rule [which] arises when the parent has utilized 'wrongful means' or 'acted with an improper purpose.'" *Speroni SpA v. Perceptron, Inc.*, 12 F. App'x at 360. The *Speroni* panel did not elaborate on that exception because it found that no such allegations were present in that case. However, in *Boulevard Associates v. Sovereign Hotels, Inc.*, 72 F.3d 1029 (2d Cir. 1995), one of the principal cases cited by *Speroni*, the Second Circuit explained that the exception generally addresses certain types of extreme behavior by controlling shareholders that "may be sufficiently egregious to cross the line and become tortious." 72 F.3d at 1037. As examples, the court postulated "a sole shareholder who orders the president

of his or her company, at gunpoint, to breach a contract with a third party," or "a sole shareholder who, using fraudulent misrepresentations, deceives a third party into breaching its contract with the shareholder's own company." *Ibid.*

The facts here do not rise to the sort of egregious conduct where the "improper motive" exception has been held to apply. The record shows, at most, that Henkel Germany acted — however unwisely, or perhaps even cynically — simply to protect what it viewed as its competitive interest and to avoid a deal that it decided was not in its interests to conclude. A corporate entity does not act with an "improper motive" merely by proceeding selfishly to preserve what it perceives as its own competitive commercial interests. *Saab Auto. AB v. Gen. Motors Co.*, 953 F. Supp. 2d 782, 792 (E.D. Mich. 2013), *aff'd*, 770 F.3d 436 (6th Cir. 2014) ("GM was driven by legitimate business concerns, protecting its own competitive position and business relationships in China and elsewhere, actions for which there can be no improper motive or interference."). Moreover, "[a]s the Michigan Court of Appeals [has held], 'it is not the task of the courts or jury to evaluate the business judgment of a corporation's top executives.'" *Wahlstrom v. Monk*, No. 15-14113, 2018 WL 1570337, at *6 (E.D. Mich. Mar. 30, 2018) (quoting *Feaheny v. Caldwell*, 175 Mich. App. 291, 306, 437 N.W.2d 358, 365 (1989) (*overruled in part on other grounds by Knight Enterprises v. RPF Oil Co.*, 299 Mich. App. 275, 281, 829 N.W.2d 345, 349 (2013)).

Henkel Germany could not tortuously interfere with the plaintiff's business relationship with Henkel US by directing the conduct of its wholly-owned subsidiary because the "unity of the parties" effectively rendered the two entities "functionally one corporation." *Servo Kinetics*, 475 F.3d at 801.

2.

Another problem for the plaintiff is that it cannot show that it had any valid business expectancy in the product licensing deal, since it affirmatively admits that it did not hold a valid license over the technology in question at any time before November 2015, long after the deal fell apart. ECF No. 1 Compl. ¶ 21 n.2 (PageID.9) ("KCP has since learned that AIS was not the exclusive owner or developer of the Technology, and that AIS and [its broker, Marsha Feltingoff,] misrepresented this fact to further AIS's interest in the Distribution Deal."); ECF No. 100 Proposed Am. Compl. ¶ 21 n.2 (PageID.3447) (same); ECF No. 1 Compl. ¶ 81 n.4 (PageID.28) ("As part of the unwinding of its relationship with AIS, KCP discovered that AIS did not have an exclusive right to license the Technology, which properly belonged to another entity. Ultimately, in November 2015, KCP procured an agreement from the true product producer and owner of the Technology."); ECF No. 100 Proposed Am. Compl. ¶ 91 n.4 (PageID.3468) (same). Certainly, the plaintiff cannot maintain that it reasonably anticipated completing the deal as a foregone conclusion in late 2014 or early 2015, when it now admits that it did not then hold any valid right to license the technology that was the centerpiece of the negotiations.

Moreover, it is undisputed that the distribution agreement never was executed, because the primary contingency — approval by Henkel Germany — never was secured. That is fatal to the proof of a valid business expectancy. *See Cedroni Ass'n, Inc. v. Tomblinson, Harburn Assocs.*, 492 Mich. 40, 52, 821 N.W.2d 1, 6 (2012) ("Because the school district retained a broad discretionary right to reject the lowest bidder, plaintiff could not have had a valid business expectancy."). Courts in this circuit applying Michigan law consistently have held that no valid business expectancy existed where only a "framework" deal or "agreement to agree" had been

concluded, which depended on critical contingencies for full realization. *Saab*, 953 F. Supp. 2d at 789-90 ("[T]he Chinese joint venture agreement, the merger agreement between Saab and JVB, and the technology licensing agreements from Saab to JVB and Youngman — that combined — all made the 'expectancy' rely on what amounted to be the equivalence of a wish list and thus, wholly uncertain as a matter of law."). In this case the parties did not even have an agreement to agree; the only contract they executed was the nondisclosure agreement, which did not require them to reach a deal. Moreover, the plaintiff's principal Fadi Nona admitted that KCP knew that the deal with Henkel US was contingent on sign-off by Henkel Germany, which never was obtained:

> Q.  Did either Zubin Rivetna, Ken Martindale or Craig Bell [of Henkel US] tell you that in order to do a deal of the size you propose that they would need people above Corp to sign off on it?

> A.  They told me that KGaA needed to step in and give final approval.

> Q.  When did they tell you that?

> A.  I believe multiple times and then we also have a voice mail from John Preysner to Melvin Babi stating something to the tune of we're waiting for final approvals from Germany.

> Q.  When was the first time that someone told you KGaA would have to give approval for such deal?

> A.  I don't believe it happened until Grant Kupko [from Henkel Germany] came in, so after Grant Kupko's involvement which was in early August.

> Q.  . . . of 2014?

> A.  Yes, ma'am.

> Q.  Other than Grant Kupko, who told you that KGaA would have had to sign off on a deal for Henkel Corp?

> A.  I want to say Cedric had told me when we were in Germany that [sic] Jan Dirk-Auris.

. . .

Q.      Did Cedric ever tell you that Jan Dirk-Auris had signed off on the contract
        for Henkel Corp?

A.      He didn't say [Dirk-Auris] signed off on the contract.

ECF No. 125-6 Fadi Nona dep. at 174-76 (PageID.5564); *see also* ECF No. 1 Compl. ¶ 65

(PageID.23) ("On February 20, 2015 Henkel US's counsel, John Preysner, called KCP and stated

that the final terms for the distribution agreement were waiting on 'approval from Germany.'").

Finally, the plaintiff has not pointed to any facts to suggest that any delay of the

negotiations caused it any tangible harm other than that a deal with Henkel never was concluded.

It has not alleged, or put forth evidence to suggest, that other deals were foregone, or other

opportunities were lost due to the pendency of the negotiations. Nona admitted that in fact the

only purpose for which KCP was incorporated was to secure the Henkel deal; nothing in the record

suggests that any other contemplated opportunity was lost when that objective was unrealized.

The undisputed facts demonstrate that KCP cannot prove all the elements of its tortious

interference claim.

III.

KCP seeks to file an amended complaint to reformulate its factual allegations and add a

count under the Connecticut Unfair Trade Practices Act. KCP argues that it did not delay in

seeking the amendment, the trial schedule would not be disrupted, and no prejudice would result

because the new claim is supported by the facts already unearthed by the existing discovery. The

defendant counters that the request to amend comes too late, it would be prejudiced because more

discovery would be needed, and, for various reasons, the new claim would be futile.

Motions to amend before trial are governed by Federal Rule of Civil Procedure 15(a). Rule 15(a)(2) requires a party seeking to amend its pleadings at this stage of the proceedings to obtain leave of court. Although Rule 15(a)(2) says that "[t]he court should freely give leave when justice so requires," leave may be denied for undue delay, bad faith by the moving party, repeated failure to cure defects by previously-allowed amendments, futility of the proposed new claim, or undue prejudice to the opposite party. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999); *Fisher v. Roberts*, 125 F.3d 974, 977 (6th Cir. 1997). "Notice and substantial prejudice to the opposing party are critical factors in determining whether an amendment should be granted." *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 458-59 (6th Cir. 2001).

## A. Delay and Prejudice

The plaintiff filed its motion to amend the complaint on April 30, 2018, the day before discovery closed. It has made no effort to justify filing its motion on the eve of the close of discovery, seeking to add a new claim, on a new legal theory, under the law of a completely different jurisdiction than the tort claim pleaded in the original complaint. Moreover, the plaintiff admits and insists that the new claim is based on the exact same facts as its breach of contract count, so there is no apparent reason why it could not have pleaded that claim at the outset of the case.

Delay alone does not justify denial of a motion brought under Rule 15(a). *Security Ins. Co. of Hartford v. Kevin Tucker & Assocs., Inc.*, 64 F.3d 1001, 1009 (6th Cir. 1995). Nor does the Rule establish a deadline within which a party must file a motion to amend. *See Lloyd v. United Liquors Corp.*, 203 F.2d 789, 793-94 (6th Cir. 1953) (reviewing a district court's denial of a motion

to amend after the entry of summary judgment).  But the party seeking to amend must "act with due diligence if it wants to take advantage of the Rule's liberality."  *Parry v. Mohawk Motors of Michigan, Inc.*, 236 F.3d 299, 306 (6th Cir. 2000) (internal quotation marks omitted).  Where "amendment is sought at a late stage in the litigation, there is an increased burden to show justification for failing to move earlier."  *Wade*, 259 F.3d at 459.

Failure to plead an available claim in a timely manner deprives an opposing party of "notice that it would have to defend" against the new claim.  *Ibid.*  Courts are especially inclined to deny a motion brought under Rule 15 "if the moving party knew the facts on which the claim or defense sought to be added were based at the time the original pleading was filed and there is no excuse for his failure to plead them."  6 Charles Alan Wright et al., Federal Practice and Procedure § 1487 (2d ed. 1990); *see Wade*, 259 F.3d at 459 (finding undue delay where the plaintiff knew the facts forming the basis of the amended claims but failed to plead the claims in the original complaint).  Similarly, where a party waits until the end of the allowable discovery period to investigate the facts of the case, due diligence is difficult to prove.

Courts will deny leave to amend where there is "some significant showing of prejudice to the opponent." *Moore v. City of Paducah*, 790 F.2d 557, 562 (6th Cir. 1986).  Here, the amendment would require the Court to reopen briefing on the parties' summary judgment motions or allow a fresh round of motion practice on the new claim, which would destroy any hope of getting this case before a jury as presently scheduled.  The Sixth Circuit readily has found prejudice and affirmed denials of leave to amend on similar facts, particularly where the plaintiff has no plausible excuse for the tardiness of its efforts to amend.  *Bridgeport Music, Inc. v. Dimension Films*, 410 F.3d 792, 806 (6th Cir. 2005) (finding that "amendments on the eve of the close of discovery would

be prejudicial to defendants and unduly delay trial"); *Duggins*, 195 F.3d at 834 (denying leave to amend because "discovery had passed, the dispositive motion deadline had passed, and a motion for summary judgment had been filed"); *Parry*, 236 F.3d at 306-07 (upholding denial of leave to amend complaint where amendment was sought more than a year after original complaint was filed, summary judgment had been granted to defendants two months earlier, and plaintiff was attempting to add a new legal theory).

The amendment comes too late and would cause undue prejudice to the defendant.

## B.  Futility

Connecticut's Unfair Trade Practices Act (CUTPA) prohibits persons from "engag[ing] in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. § 42-110b(a).  "CUTPA defines 'trade or commerce' as 'the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity or thing of value *in this state*.'"  *Uniroyal Chem. Co. v. Drexel Chem. Co.*, 931 F. Supp. 132, 140 (D. Conn. 1996) (quoting Conn. Gen. Stat. § 42-110a)).  "Despite this language, at least one court has held that CUTPA does not necessarily require that a violation occur within Connecticut as long as it is tied to a form of trade or commerce intimately associated with Connecticut."  *Ibid.*  "In addition, at least under Connecticut's choice of law principles, a tort is deemed to have occurred where the injury was sustained, and in misrepresentation cases, the injury occurs where the 'economic impact' is felt." *Ibid.*

The proposed amendment would be futile because the plain language of the Connecticut statute expressly states that it governs commercial conduct that occurs "in this state"; the proposed

amended complaint does not allege that anything of consequence in the parties' dealings occurred in Connecticut. Nor does it allege any facts that would allow an inference that any part of the parties' dealings were "intimately associated with Connecticut." The only passing reference to Connecticut in the proposed amended complaint concerns a trip by KCP's principal to meet with Henkel's executives there, which occurred months after the negotiations fell apart, and during which nothing even allegedly improper transpired.

The only ground offered by the plaintiff to establish the required nexus with Connecticut is the choice of law clause in the nondisclosure agreement. But the plaintiff has not cited any authority holding that such a marginal incident of the parties' dealings can establish an "intimate association" between a commercial transaction and the state. Moreover, the plaintiff cannot rely on the fact that Henkel US is incorporated in Connecticut, since it has not sued Henkel US in this case, and never has alleged any conduct by that entity that it contends was improper. The facts here concern negotiations about a joint venture that the plaintiff insists was centered on the State of Michigan, between corporate entities from Michigan and Germany, involving negotiations conducted by their principals in Michigan, Germany, and New Jersey, with no apparent connection between those dealings and the State of Connecticut. *See Victor G. Reiling Assocs. v. Fisher-Price, Inc.*, 409 F. Supp. 2d 112, 122 (D. Conn. 2006) ("[T]he allegedly wrongful conduct was not tied to a form of trade or commerce intimately associated with Connecticut, rather, the allegedly wrongful conduct involved a decision made in New York, which was communicated to DI in Connecticut, along with threats made at a meeting in New York.").

Because the plaintiff has not stated facts that could sustain a claim under the CUTPA, the proposed amendment would be futile.

IV.

KCP's complaint artfully pleaded a sinister scheme by the defendant to purloin a business opportunity by using confidential information that supposedly was protected by a nondisclosure agreement. But after the discovery was completed and the facts explored, the plaintiff could not "make good on the promise of the pleadings by laying out enough evidence . . . to demonstrate that a genuine issue on a material fact exists" on all the elements of its claims. Its effort to amend its complaint is untimely, unfairly prejudicial, and futile.

Accordingly, it is **ORDERED** that the defendant's motion for summary judgment (ECF No. 125) is **GRANTED**.

It is further **ORDERED** that the plaintiff's motion for leave to amend its complaint (ECF No. 96) is **DENIED**.

It is further **ORDERED** that the complaint is **DISMISSED WITH PREJUDICE**.

It is further **ORDERD** that the parties' motions to strike various expert witnesses (ECF. No. 121, 122, 123, 124), the motions *in limine* (ECF. No. 157, 158), and the plaintiff's motion for sanctions (ECF No. 93) are **DISMISSED as moot**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Date: October 11, 2018

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first-class U.S. mail on October 11, 2018.

s/Susan K. Pinkowski
SUSAN K. PINKOWSKI